[Crim. No. 1826. In Bank.—February 4, 1914.]

THE PEOPLE, Respondent, v. J. W. ELMORE, Appellant.

CRIMINAL LAW—MURDER—VERDICT OF MURDER OF SECOND DEGREE— EFFECT AS ACQUITTAL OF HIGHER OFFENSE—WANT OF DELIBERA- TION AND PREMEDITATION.—In order to constitute murder of the first degree there must be a willful, deliberate, and premeditated killing, as well as malice aforethought. In a prosecution for such offense, the jury by rendering a verdict finding the defendant guilty of murder in the second degree, in effect acquitted him of murder of the first degree. This is equivalent to a finding by the jury that the act of killing was not deliberate or premeditated, and necessarily implies that the jury believed that when the defendant, prior to the attack, took out his knife with which the fatal blow was struck, opened it and kept it open in his hand, he did so without any design to kill the deceased.

ID.—DISTINCTION BETWEEN MURDER AND MANSLAUGHTER—INTENTION TO KILL.—Whether a homicide amounts to murder or to manslaughter merely, does not depend upon the presence or absence of the intent to kill. In either case there may be a present intention to kill at the moment of the commission of the act. But when the mortal blow is struck in the heat of passion, excited by a quarrel, sudden, and of sufficient violence to amount to adequate provocation, the law, out of forbearance of the weakness of human nature, will disregard the actual intent and will reduce the offense to manslaughter. In such case, although the intent to kill exists, it is not that deliberate and malicious intent which is an essential element in the crime of murder.

ID.—DISCRETION OF JURORS IN CONSIDERING EVIDENCE—UNREASONABLE INFERENCES—NEW TRIAL—REVERSAL ON APPEAL.—The discretion of jurors in considering the effect of evidence as proof is not absolute. It is their duty to avoid fanciful theories and unreasonable inferences and not to resort to imagination or suspicion. If the trial court is satisfied that a verdict is supported by these alone, it should set it aside, even if there is a substantial conflict of the evidence. If there is no substantial conflict, and these are its only foundation, an appellate court should reverse the judgment.

ID.—EVIDENCE—CONVICTION OF MURDER OF SECOND DEGREE NOT JUSTIFIED.—The evidence in the present case is held not to justify the verdict of murder of the second degree, and that, at most, it proves nothing more than manslaughter, and that for this reason the judgment must be reversed.

ID.—PHOTOGRAPHS OF WOUNDS—ADMISSIBILITY OF IN EVIDENCE.—In a prosecution for murder, photographs of a part of the body of the deceased, taken shortly after his death, are admissible in evidence for the purpose of showing the size and character of the wound inflicted upon him. They should not be offered or admitted for any other purpose, nor without sufficient explanation of the time when they were taken and the changes they show in the natural conditions.

APPEAL from a judgment of the Superior Court of Glenn County. Wm. M. Finch, Judge.

The facts are stated in the opinion of the court.

Glenn West, and Ben. F. Geis, for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and Claude F. Purkitt, District Attorney, for Respondent.

SHAW, J.—The defendant was charged by indictment with the crime of murder of the first degree. He was convicted of murder of the second degree and was sentenced therefor to ten. years' imprisonment. He appealed to the district court of appeal of the third district. That court being unable to agree upon a decision, the cause was transferred to this court.

The victim of the homicide was one Fred W. Polio. There is no dispute over the fact that his death was caused by a knife wound inflicted by Elmore on December 27, 1912. Polio died therefrom a day or two afterward. The indictment was returned on December 31, 1912. The conviction was had upon the second trial of the cause, which was begun on March 18, 1913, and ended on March 20, 1913. There is no substantial conflict in the evidence. George H. Rucker was the only eye witness to the whole affair and his testimony, in effect, constitutes the case against the defendant. One Allen Rudolph saw the latter part of the affair but his testimony differs in no important particular from that of Rucker. Rucker gave a clear statement of the case of which the following is the substance:

The affair occurred in the Eagle saloon in the town of Willows, in Glenn County. On that day Elmore was sitting near the stove, in which there was a warm fire, with the witness Rucker and an old man, an ex-soldier, known as Smithy. Smithy was sitting by the side of Elmore and was in a state of stupor from intoxication. Polio, being somewhat warmed by liquor but not sufficiently to impair his faculties or affect his movements, entered the saloon, and, apparently in good nature, began to play roughly with Smithy, lifting his hat and jamming it down on his head several times, slapping him on the head and swaying his body and head about. After engaging in this for a few minutes, Polio went out of the saloon and in a very short time re-entered and again began to move Smithy about, finally hitting him on the side of the head with his open hand hard enough to knock him and his chair over against Elmore. Elmore pushed Smithy, still sitting in his chair, back to an upright position and said to Polio "Why don't you let him alone. That ain't no way to treat a man." Polio made some reply which Rucker did not hear. Elmore then said: "I am not butting in, but at the same time

it ain't right. May be you know this man." Polio said: "No, I don't, do you?" Elmore said: "No, I don't know him nor you neither. But it ain't right to treat a man that way, an old man." Polio then stepped up to Elmore and slapped him on the side of the head, calling him a "son-of-a bitch," and stepped back, saying "You come outside, I can lick both of you." Elmore rose and said: "No, I am not going out to fight you. I don't want to fight; I want you to let me alone. You are a much younger man than I am. I want you to let me alone." Upon saying this he sat down again. Polio then ran to Smithy, caught his feet, jerked him out of his chair and several feet away to the floor, then helped him to his feet and shoved him back into the chair, saying "You don't amount to nothing." While Polio was thus engaged Elmore arose and stood by the stove with his left hand resting upon a railing about three feet high surrounding the stove, made of iron pipe. From subsequent events it seems that Elmore held in his left hand a small pearl handled pocket knife with the blade open. The blade was two inches long and very sharp. Rucker did not at that time observe it. Polio after placing the old man back into the chair, stepped away a few feet and then turned facing Elmore in an attitude as if about to start toward him, at which Elmore said: "You son-of-a-bitch, don't you hit me. You let me alone or I will hurt you." He was then standing facing Polio between the stove and the wall with his hand on the railing. Polio, paying no attention to this warning, rushed at Elmore and struck him on the shoulder, causing him to bend over the railing which he grabbed with the left hand and thus avoided falling. As Elmore was straightening up Polio struck another blow, which Elmore, still somewhat stooping, warded off with his right hand, at the same time making an upward thrust under Polio's arm with the knife in his left hand, striking Polio in the neck with the knife and thereby giving him the fatal wound. Polio then grabbed Elmore's throat with both hands and whirled him around the stove to the other side, Elmore during that passage striking Polio in the ribs two or three times with his right fist. Polio then released his hold of Elmore and stepped back several feet. Elmore stepped back at the same time, saying: "Now, you son-of-a-bitch, you see what you have got." Rudolph, the other eye witness to this

part of the affair, testified that these words were "Now, you take your medicine, you see what you made me do." Polio then went out at the front door of the saloon and sat down on the curb. Elmore and Smithy went out of the back door into the back yard. All the foregoing acts occurred as rapidly as the successive motions could be made. Just after Polio went out, an officer who was near by came in the front door as Elmore passed out the back door and asked Rucker: "Where is the man who done it?" referring to the wounding of Polio. Rucker, not then knowing Elmore's name pointed toward Elmore, then in the back yard, saying "There he goes." The officer went into the back yard and, noticing Elmore and Smithy, but not understanding that Elmore was the man Rucker referred to, asked Elmore which way the man went who did the work. Elmore told him that the man went out into the alley and up toward Walnut Street. The officer then departed in that direction and Elmore and Smithy went back into the saloon. In a few moments the officer came in at the front door, asked Rucker for a description of the man, was told that it was Elmore and thereupon arrested him.

The railing around the stove was about three and a half feet from the wall. At the time Polio made the rush which resulted in his fatal wound, Elmore was standing in this space. There were two chairs behind him so that he could not readily get out of the way and thus avoid Polio's attack. Polio was a young man about twenty-eight years of age, of rather burly build and strong physique, weighing from one hundred and sixty-five to one hundred and eighty pounds. Elmore was a rather slight man and had been subject to epileptic fits. One of these fits occurred the day after the homicide. There is nothing to show that Elmore had any previous ill feeling toward Polio or that they had any previous acquaintance. After he was arrested and as he was being taken to jail Elmore said to the officer, "Black, you know I wouldn't do anything like that." At the jail he said he was not the man who did it. Some blood appearing upon his left hand he was asked how it came there. He hesitated and then said he got it in killing some chickens and turkeys for Zumwalt that morning. There were no other wounds inflicted upon Polio. He was unarmed at the time. The foregoing comprises all the evidence in the case and includes all that tends

CLXVII Cal.—14

to indicate the intent of Elmore at the moment when he inflicted the wound.

In order to constitute murder of the first degree there must be a willful, deliberate, and premeditated killing, as well as malice aforethought. By rendering a verdict finding the defendant guilty of murder in the second degree, the jury, in effect, acquitted him of murder of the first degree. This was equivalent to a finding by the jury that the act of killing was not deliberate or premeditated and this necessarily implies that the jury believed that when Elmore, prior to the attack, took out his knife, opened it and kept it open in his hand, he did so without any design to kill Polio. Consequently, in considering the sufficiency of the evidence to support the verdict, we must assume that he had no such previous design. This assumption is consistent with the evidence. The distinction between murder and manslaughter particularly applicable to this case is clearly stated in *People* v. *Freel,* 48 Cal. 437, as follows: "Whether the homicide amounts to murder or to manslaughter merely, does not depend upon the presence or absence of the intent to kill. In either case there may be a present intention to kill at the moment of the commission of the act. But when the mortal blow is struck in the heat of passion, excited by a quarrel, sudden, and of sufficient violence to amount to adequate provocation, the law, out of forbearance for the weakness of human nature, will disregard the actual intent and will reduce the offense to manslaughter. In such case, although the intent to kill exists, it is not that deliberate and malicious intent which is an essential element in the crime of murder." Again, in *People* v. *Doyell,* 48 Cal. 85, 96, the court says: "On the other hand, the law, in some cases of voluntary manslaughter, disregards the actual intent to kill, when the killing is done in a sudden passion, caused by sufficient provocation. In the former cases (certain kinds of murder of the second degree) the slayer is presumed to be actuated by an intent which may not exist; in the latter (out of forbearance for the weakness of human nature) the slayer is presumed not to be actuated by an intent to kill, although such intent may in fact exist."

From these authorities it is clear that the mere fact, if it be a fact, that Elmore, at the very moment of making the fatal

cut, intended thereby to kill Polio, does not necessarily make the case murder, either of the first or second degree. The discretion of jurors in considering the effect of evidence as proof is not absolute. It is their duty to avoid fanciful theories and unreasonable inferences and not to resort to imagination or suspicion. If the trial court is satisfied that a verdict is supported by these alone, it should set it aside, even if there is a substantial conflict of the evidence. If there is no substantial conflict and these are its only foundation, an appellate court should reverse the judgment. Upon any reasonable view of the evidence in this case, the first impression would be that the fatal wound was inflicted without legal malice and solely as the result of the sudden heat of passion excited in Elmore by the unprovoked attack and violent blows of Polio. There may be also room for argument that it was the result of his belief that it was necessary for his protection from the great bodily injury then to him apparently imminent from that attack. As to this we express no opinion. The blows given would naturally arouse a sudden passion. The law deems such provocation sufficient to support the theory of manslaughter as defined in the code. In the case first stated, Elmore would be guilty of manslaughter, only. He would not be guilty of murder of the second degree, as the jury found. Disregarding the theory of self defense, we find nothing in the evidence that will reasonably justify the conclusion that the wound was inflicted otherwise than as the result of that sudden passion which reduces an unlawful homicide from murder to manslaughter. All the circumstances tend to show that Elmore was acting in good faith and really desired to avoid any quarrel or difficulty. His poor attempt to deceive the officer, after the fight, knowing, as he must upon the least reflection, that there were eye witnesses, is reasonably explainable upon the theory that he was somewhat agitated by the result of the altercation suddenly forced upon him. We cannot perceive that it tended to show malice. There is nothing indicating previous ill feeling on his part, or upon which the existence of legal malice can be predicated unless we resort to imagination and suspicion, or assume facts not in evidence. We are of the opinion that the evidence does not justify the verdict of murder of the second degree, that, at most, it proves nothing

more than manslaughter, and that for this reason the judgment must be reversed.

Two photographs of Polio's neck, taken shortly after his death, were received in evidence for the purpose of showing the size and character of the wound inflicted upon him. In one of these the cut appeared as it was sewed up prior to his death, in the other the stitches had been removed and the edges of the cut were held apart by two short sticks inserted for the purpose, thus disclosing the incision of the wind pipe made by the wound. There is nothing to show that these photographs were offered for any other purpose than to show the size and extent of the wound. They were competent for that purpose under the circumstances and with the explanatory proof made. They should not be offered or admitted for any other purpose nor without sufficient explanation of the time when they were taken and the changes they show in the natural conditions. Some objections are made to the instructions which we think are not well taken, but we do not consider it necessary to discuss them. The alleged misconduct of the district attorney will doubtless not occur upon a second trial, and we deem it unnecessary to describe it.

The judgment is reversed.

Lorigan, J., Melvin, J., and Henshaw, J., concurred.

Rehearing denied.