[No. B137930. Second Dist., Div. Four. Feb. 15, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
CALVIN CROWE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions of the opinion to be published are: Introduction, Statement of Facts, Discussion C—Instructional Error, Discussion C.2—Submission of CALJIC No. 8.40, and Disposition.

## COUNSEL

Susan E. Nash, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Mary Sanchez and Michael W. Whitaker, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## VOGEL (C. S.), P. J.—

### INTRODUCTION

A jury convicted Calvin Crowe of second degree murder (Pen. Code, §§ 187, 189)[1] and being a felon in possession of a firearm (§ 12021, subd. (a)(1)). The jury found true the sentencing enhancements that defendant personally and intentionally discharged a firearm, killing the victim (§ 12022.53), and that he personally used a firearm (§ 12022.5, subd. (a)(1)).

---

[1] All subsequent statutory references are to the Penal Code.

In a separate proceeding, the jury found true the allegation, pled both under the "Three Strikes" law and section 667, subdivision (a), that defendant had suffered a serious felony conviction in 1998 for the grossly negligent discharge of a firearm (§ 246.3) (*People v. Crowe* (Super. Ct. L.A. County, 1998, No. SA032968)). The court denied defendant's motion to strike the prior conviction and sentenced him to a term of 55 years to life, plus 5 years.

In an opinion rendered last year after trial was completed in this matter, the California Supreme Court held intent to kill is not an element of voluntary manslaughter. (*People v. Lasko* (2000) 23 Cal.4th 101 [96 Cal.Rptr.2d 441, 999 P.2d 666].) In this case the jury, pursuant to defendant's request, had been instructed about, inter alia, the lesser included offense of voluntary manslaughter. That instruction contained the then standard language that voluntary manslaughter required an intent to kill. Relying upon *People v. Lasko,* defendant contends use of this instruction constitutes reversible error. In the published portion of this opinion, we first reject the Attorney General's argument that defendant may not rely upon *People v. Lasko,* but then conclude that any error occasioned by the use of the instruction was nonprejudicial.

In the nonpublished portion of this appeal, we address the remainder of defendant's contentions. We find no merit to his claims that three of the trial court's evidentiary rulings were error and that the prosecutor committed two acts of misconduct. We reject defendant's two additional claims of prejudicial instructional error. In regard to the finding he suffered a prior felony conviction, we find merit to his contention that the People failed to prove it was a serious felony within the meaning of statutory law, but reject his argument that retrial on that allegation is barred by law of the case or res judicata. Lastly, we find no merit to his claim that the 25-year-to-life sentence imposed for the section 12022.53 finding constitutes cruel or unusual punishment, either on its face or as applied.

## STATEMENT OF FACTS

This murder arises out of a love triangle. Defendant, who is married, was having an affair with Barbara White. The victim, Donovan Eady, was White's boyfriend. Defendant killed Eady when he found Eady and White together at a hotel.

Although the prosecution sought to convict defendant of first degree murder, the jury acquitted him of that offense and instead found him guilty of second degree murder. In so doing, the jury rejected defendant's primary defense that he acted in self-defense.

*The Prosecution's Case-in-chief*

The crime occurred at the Ramada Inn in Culver City. Sometime after 2:00 a.m. on October 11, 1998, White went to the hotel security office. She told Ernesto Yznaga, the hotel security guard, "she was having problems with the 'boyfriend,'" and asked him to escort her to her room so she could retrieve her belongings and leave. Yznaga agreed.

Yznaga and White took the elevator to the 11th floor. As they walked out of the elevator, Yznaga saw defendant and Eady speaking. Eady told Yznaga defendant had a gun. Defendant denied the accusation and walked to the elevator. After defendant entered the elevator, Eady tried to stop its door from closing. Eady reiterated defendant had a gun and stated defendant had earlier pointed the gun at his head. During this exchange, Eady was not armed and did not threaten defendant. Defendant denied Eady's statements but then pulled out a gun. Eady let go of the elevator door. Defendant fired one round. The bullet hit the elevator door.

The elevator door closed and then reopened. Defendant partially stepped out. Eady raised his right arm to protect his face. Holding the elevator door with one hand, defendant shot Eady in the back. Eady was several feet from defendant. Yznaga stepped toward the elevator. Defendant aimed the gun at him. Yznaga stood still until the elevator door closed.

Eady died within a few minutes from the gunshot wound. He was approximately 6 feet tall and weighed 218 pounds. Defendant weighed between 225 and 235 pounds and is more than 6 feet tall.

The police later searched White's hotel room and found no weapon. In addition, no weapon was found in White's purse.

*Defense Case*

As set forth in defendant's testimony and as framed by defense counsel's closing argument, defendant's primary claim was that he acted in self-defense.

Defendant testified as follows. He began his affair with White in 1993. He rented her an apartment. In the summer of 1998, he learned she was having a series of affairs and, in fact, discovered Eady with White in her apartment. After this discovery, Eady threatened defendant on multiple occasions, sometimes in person and sometimes on the phone.

In October 1998, defendant was paying for White's room at the Ramada Inn where the murder occurred. He had a key to the room and often visited

her. On the day in question, defendant went to the hotel room to meet White. She was not there so he waited for her. After several hours, she still had not come back so he decided to leave. As he opened the door to the hallway, he saw White with Eady. He was surprised to see Eady because he thought Eady was in jail. Defendant asked White why she was there. She explained she had come "to get [her] things." Defendant claimed that Eady then pointed a gun at him. Fearing for his life, defendant took out his gun but did not point it at Eady. Defendant had brought the gun for self-protection because he had previously been the victim of a robbery and assault.

Defendant asked Eady to leave the hotel. Eady refused. According to defendant, an argument and struggle ensued in which White seized Eady's gun from Eady and then left. Defendant and Eady went into the room. Eady attacked him and ran out. Defendant testified he was very afraid of Eady and feared Eady would kill him because he had often threatened to do so. Defendant decided to leave. As he was waiting for the elevator, White returned with Yznaga, the hotel security guard. Defendant denied having told Yznaga that he (defendant) did not have a gun and claimed Yznaga had fabricated that testimony in conjunction with White.

Defendant testified he entered the elevator and as the door began to close, Eady grabbed the door. Defendant told him to let him go. When Eady did not remove his hand, he (defendant) fired one shot as a warning. Eady backed off but again tried to prevent the elevator door from closing. Defendant then shot his gun again because he was fearful that White had given Eady his gun back; that Eady was holding the gun in a hand defendant could not see; and that Eady was going to shoot him. Defendant claimed that he did not intend to kill Eady; that he only wanted to frighten him away from the elevator; and that he did not know in which direction he fired the gun. Defendant denied having pointed the gun at Yznaga as the elevator door closed. On cross-examination, defendant conceded that he was "aware that by firing a gun in that location, that [he] could have hit another guest" and that "by firing a gun not just once, but twice, [he was] placing innocent bystanders in danger to their life" but that he nonetheless "[twice] fired the gun."

Defendant left the hotel and drove to the beach where he threw the gun into the ocean. He drove to his second home in Antelope Valley but left when he saw the police there. He returned to his home in Los Angeles but did not stop because the police were also at that location. He later turned himself into the police.

*People's Rebuttal*

White testified that in June 1998 she told defendant about her relationship with Eady. Defendant became very angry. On one occasion, he asked White

to point Eady out so he (defendant) could have him killed. Eady was very frightened of defendant and wanted to purchase a gun but was unable to do so because of his (Eady's) criminal record.

During the week prior to October 11, 1998, White told defendant that she wanted to end their relationship. Defendant reacted negatively and began to continuously telephone her. For example, her phone records indicated that on the day of the shooting, defendant telephoned her 67 times.

On October 11, 1998, she and Eady went to the hotel room to pick up her property so she could move in with Eady. Defendant opened the door from the inside and confronted them with a gun. He pointed the weapon at Eady and said: "I just feeling like killing your mother-fucking ass." Contrary to what defendant had testified, Eady did *not* have a gun. White left to retrieve a security guard because defendant would not let Eady leave. When she returned with Yznaga, Eady told Yznaga that defendant had a gun and was trying to kill him. Defendant denied it. Eady repeated the accusation. White then heard a shot and saw Eady fall to the ground. Defendant pointed the gun at Yznaga as he reentered the elevator and left. According to White, at no point during this confrontation did Eady ever threaten defendant or lunge at him.

## DISCUSSION

### A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. INSTRUCTIONAL ERROR

The People sought to convict defendant of first degree murder. The jury was instructed about the elements of both first degree and second degree murder. Because defendant had testified he shot Eady out of fear for his life, instructions about self-defense were likewise submitted. In addition, pursuant to defendant's request, the jury was instructed about voluntary manslaughter (imperfect self-defense and a killing in the heat of passion) and involuntary manslaughter (a killing committed during the commission of an unlawful act dangerous to human life: defendant's shooting of his gun from the elevator).

In the context of these instructions, defendant makes three different claims of error. We examine each one separately.

*See footnote, *ante*, page 86.

### 1. *Refusal to Submit CALJIC No. 5.51\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 2. *Submission of CALJIC No. 8.40*

*Factual Background*

The court submitted CALJIC No. 8.40, the standard instruction then in effect defining voluntary manslaughter. The instruction stated that an element of voluntary manslaughter, whether based upon a claim of imperfect self-defense or a heat of passion killing, is that the defendant intended to kill.[4] Defendant contends submission of this instruction constitutes prejudicial error because the California Supreme Court has subsequently clarified that intent to kill is *not* an element of voluntary manslaughter.

Trial was conducted in summer 1999. Almost a year later, the California Supreme Court concluded, in two companion cases, that intent to kill was not an element of voluntary manslaughter and that it is error to so instruct the jury. (*People v. Blakeley* (2000) 23 Cal.4th 82 [96 Cal.Rptr.2d 451, 999 P.2d 675]; *People v. Lasko, supra,* 23 Cal.4th 101; see also *People v. Rios* (2000) 23 Cal.4th 450, 461, fn. 7 [97 Cal.Rptr.2d 512, 2 P.3d 1066].)[5] It noted that section 192, which defines voluntary manslaughter, contains no

---

[*]See footnote, *ante,* page 86.

[4]As given, the instruction read:

"*Every person who unlawfully kills* another human being without malice aforethought but *with an intent to kill . . . is guilty of voluntary manslaughter* in violation of Penal Code Section 192(a).

"There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion or in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury.

"*In order to prove this crime, each of the following elements must be proved*:

"1. A human being was killed;

"2. The killing was unlawful; and

"3. *The killing was done with the intent to kill.*

"A killing is unlawful . . . if it was not justifiable." (Italics added.)

[5]Essentially, these holdings have broadened the class of situations in which a defendant could be found guilty of voluntary manslaughter. The court held that if a defendant commits an *unintentional killing* in either of two circumstances, he can nonetheless be found guilty of voluntary manslaughter. The first circumstance is when an unintentional killing occurs in the course of an unreasonable exercise of self-defense (imperfect self-defense) by a defendant who acts with conscious disregard for life and knows his conduct is life-endangering. The second circumstance is when a defendant, acting with conscious disregard for life and the knowledge his conduct endangers the life of another, unintentionally but unlawfully kills in a sudden quarrel or heat of passion.

Thus defendant errs when he suggests these two cases narrowed the class of situations in which a defendant could be convicted of voluntary manslaughter. As the *Lasko* court noted,

requirement of intent to kill.[6] (*People v. Lasko, supra,* 23 Cal.4th at p. 108.) It rejected the Attorney General's argument that "one who shoots and kills another in the heat of passion and with the intent to kill is guilty only of voluntary manslaughter, yet one who shoots and kills another in the heat of passion and with conscious disregard for life but with the intent merely to injure, a less culpable mental state than intent to kill, is guilty of murder." (*Id.* at pp. 108-109.) It concluded: "[T]he presence or absence of an intent to kill is not dispositive of whether the crime committed is murder or the lesser offense of voluntary manslaughter." (*Id.* at p. 110; see also *People v. Blakeley, supra,* 23 Cal.4th 82, 89-90.) This conclusion was consistent with language found in very early decisions of the court.[7] (*Lasko,* at p. 109.) The court stated that while some of its later decisions appeared to have stated to the contrary, "[i]n each of these cases, that observation was mere dictum." (*Id.* at p. 110.) The court noted its conclusion was consistent with federal case law interpreting the federal voluntary manslaughter statute which contains language identical to section 192. (*Lasko,* 23 Cal.4th at p. 111.) The court then applied its holding to the appellant in *People v. Lasko* but did not discuss whether its holding would apply to other pending appeals.

## Discussion

■ The first issue is whether defendant can avail himself of *Lasko's* holding to argue that submission of CALJIC No. 8.40 constitutes prejudicial error. In his respondent's brief, the Attorney General did not address that issue but simply argued defendant could not establish prejudice. However, by a subsequent letter brief, he informed us that "it has become the position of [that office] that the holding of *People v. Lasko, supra,* is not subject to retroactive application" and offered a lengthy analysis to support that conclusion. Defendant's appellate counsel has since filed a letter brief contesting that claim.

We conclude defendant may rely upon *Lasko.* If a decision does *not* establish a new rule, "the decision simply becomes part of the body of case

---

none of its previous decisions had adopted the Attorney General's position that "a defendant who kills in a sudden quarrel or heat of passion, with conscious disregard for life but without intent to kill, is guilty of *murder.*" (*People v. Lasko, supra,* 23 Cal.4th at p. 110, fn. omitted, italics in original.)

[6]In pertinent part, section 192 states: "Manslaughter is the unlawful killing of a human being without malice. It is . . . : [¶] (a) Voluntary—upon a sudden quarrel or heat of passion." The concept of voluntary manslaughter based upon imperfect self-defense has its basis in decisional law. (*People v. Barton* (1995) 12 Cal.4th 186, 199 [47 Cal.Rptr.2d 569, 906 P.2d 531], and cases cited therein.)

[7]These decisions were *People v. Freel* (1874) 48 Cal. 436, 437, *People v. Doyell* (1874) 48 Cal. 85, 96, and *People v. Elmore* (1914) 167 Cal. 205, 210 [138 P. 989].

law of this state, and under ordinary principles of stare decisis applies in all cases not yet final. 'As a rule, judicial decisions apply "retroactively." [Citation.] Indeed, a legal system based on precedent has a built-in presumption of retroactivity.' [Citation.]" (*People v. Guerra* (1984) 37 Cal.3d 385, 399 [208 Cal.Rptr. 162, 690 P.2d 635].)

An example which illustrates the type of decision that does not establish a new rule of law and therefore should be applied to all cases not yet final is one that gives "effect to a statutory rule that the courts had theretofore misconstrued . . . ." (*People v. Guerra, supra,* 37 Cal.3d, fn. 13 at p. 399.) We believe this case involves that type of decision. In that regard, *People v. Mutch* (1971) 4 Cal.3d 389 [93 Cal.Rptr. 721, 482 P.2d 633] is instructive. *Mutch* posed the question of whether retroactive effect should be given to the prior decision in *People v. Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677] which had interpreted the 1951 amendment to section 209 defining the crime of kidnapping for the purpose of robbery. The *Daniels* court had reversed the convictions on the ground that when the statute was properly construed, the evidence offered at trial was legally insufficient to support the verdicts. The *Mutch* court characterized the significance of *Daniels* as follows: "[T]he purpose of our decision in *Daniels* was not to 'redefine' the crime of kidnaping to commit robbery—under our tripartite system of government, that power is vested exclusively in the legislative branch—but simply to declare what the intent of the Legislature has been in this regard since the enactment of the 1951 amendment to section 209. . . . In *Daniels* we did not overturn a judge-made rule of common law; rather, we recognized a statutory rule which the Legislature adopted in 1951 *but to which the courts had not previously given appropriate effect.* [¶] . . . [O]ur decision in *Daniels* . . . confirmed a substantive definition of crime duly promulgated by the Legislature." (*People v. Mutch, supra,* 4 Cal.3d at pp. 394-395, italics added.)

By a parity of reasoning, *People v. Lasko, supra,* 23 Cal.4th 101, did not "redefine" the crime of voluntary manslaughter. Instead, it simply acknowledged the exact words contained in the crime's statutory definition and gave effect to the fact that the Legislature had not included intent to kill in that definition although previous decisions had not given proper recognition to that omission. The consequence of our reaching this conclusion is that "we need not undertake the often perilous task of applying to the facts of this case the test of 'retroactivity' " developed in prior decisions. (*People v. Mutch, supra,* 4 Cal.3d at p. 394.) In other words, this defendant, as well as all other defendants whose cases are not yet final, may rely upon *People v. Lasko*'s holding to claim prejudicial error occurred.

■ We now turn to the merits of the contention. Defendant argues the use of CALJIC No. 8.40 constitutes prejudicial error because it required the

jury to convict him of the more serious crime of second degree murder if it found he killed Eady without the intent to kill. Defendant points to the fact the jury was instructed that second degree murder required only that defendant deliberately perform an act "with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being." (CALJIC No. 8.31.) That is, defendant argues that because the jury was instructed that second degree murder required only a conscious disregard for life but that voluntary manslaughter required intent to kill, if the jury credited his testimony that he lacked intent to kill, the jury "had to choose a verdict of second degree murder over voluntary manslaughter . . . ."

The *Lasko* court rejected a similar argument. It first held that if a defendant claims prejudicial instructional error because the trial court incorrectly instructed the jury that voluntary manslaughter required an intent to kill, the *Watson*[8] test governs. " 'A conviction of the charged offense [of murder] may be reversed in consequence of this form of error only if, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable" the defendant would have obtained a more favorable outcome [conviction of voluntary manslaughter instead of murder] had the error not occurred. [Citation.]' " (*People v. Lasko, supra,* 23 Cal.4th at p. 111.)

The *Lasko* court found no prejudice for three reasons, each of which is present in this case.

The first reason is that the jury was instructed pursuant to CALJIC No. 8.50, which distinguishes murder and manslaughter. It states, in pertinent part: "To establish that a killing is murder and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the heat of passion or upon a sudden quarrel or in the actual, even though unreasonable, belief in the necessity to defend against imminent peril to life or great bodily injury." Thus, the jury was instructed that regardless of whether Eady's killing was intentional or unintentional, defendant could *not* be convicted of murder *unless the prosecution proved beyond a reasonable doubt that, at the time of the killing, defendant was not unreasonably acting in exercise of the privilege of self-defense and was not acting in a heat of passion.* Had the jury believed defendant *unintentionally* killed Eady either in the heat of passion or in imperfect self-defense, it would have concluded that it could not convict him of murder and that further it could not convict him of voluntary

---

[8]*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

manslaughter because he lacked the intent to kill. If that had been what the jury believed, it would have convicted defendant of involuntary manslaughter, a lesser offense within the crime of murder, upon which it was also instructed. Instead, the jury convicted defendant of second degree murder, demonstrating that it found beyond a reasonable doubt that defendant did not kill Eady either in the heat of passion or in imperfect self-defense, the predicates of a finding of voluntary manslaughter.

The second reason is that the parties did not prominently argue the theory of voluntary manslaughter. In the opening portion of his closing argument, the prosecutor devoted himself exclusively to arguing murder, with the emphasis being that it was murder of the first degree. The defense closing argument focused on self-defense to support the claim the homicide was justifiable and gave only passing reference to voluntary manslaughter. In his rebuttal, the prosecutor briefly explained why voluntary manslaughter was an inapplicable theory.

The third reason is that the evidence in this case strongly suggests an intent to kill. Defendant shot an unarmed man in the back. Defendant had a motive: jealousy. Defendant's actions suggest planning and therefore intent: he went to the scene (the Ramada Inn) armed with a gun and with substantial knowledge he would find Eady with White. His actions immediately after the crime were not those of an unintentional killer: he disposed of the murder weapon and would not enter either of his homes when he saw the police were present.

Given the above three reasons, it is not reasonably probable a properly instructed jury would have convicted defendant of the lesser offense of voluntary manslaughter.[9] (See *People v. Lasko, supra,* 23 Cal.4th at pp. 111-113.)

3. *Failure to Instruct on One Specific Theory of Involuntary Manslaughter**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

D.-F.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

[9]Defendant's cursory argument that this instructional error also violated his federal rights to trial by jury and due process of law is without merit. (*People v. Lasko, supra,* 23 Cal.4th 101, 113.)

*See footnote, *ante,* page 86.

## DISPOSITION

The judgment is affirmed, except that defendant's sentence is vacated, the true findings as to the allegations that he suffered a 1998 conviction for a grossly negligent discharge of a firearm in case No. SA032968 pursuant to (1) the Three Strikes law, and (2) section 667, subdivision (a)(1) are reversed, and the matter is remanded for a retrial as to those allegations and for resentencing as appropriate.

Epstein, J., and Curry, J., concurred.

A petition for a rehearing was denied March 8, 2001, and appellant's petition for review by the Supreme Court was denied May 16, 2001.