Filed 4/2/13  P. v. Chaira CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053083 |
| v. | (Super.Ct.No. RIF151153) |
| MANUEL CHAIRA, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Sherrill A. Ellsworth, Judge.  Affirmed in part; reversed in part.

Law Offices of E. Thomas Dunn, Jr., and E. Thomas Dunn, Jr., for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.  INTRODUCTION

Defendant and appellant Manuel Chaira, Jr., appeals from his conviction of attempted deliberate and premeditated murder (Pen. Code,[1] §§ 664, 187; counts 1 & 2); assault with a firearm (§ 245, subd. (a)(2)); counts 3 & 4) and gang participation (§ 186.22, subd. (a); count 5), along with true findings on enhancement allegations (§§ 12022.53, subd. (c), 186.22, subd. (b), 12022.53, subd. (d), and 12022.7, subd. (a)). He contends his convictions for attempted murder must be reversed, because the evidence was insufficient to establish an intent to kill, and his sentence of 20 years plus 69 years to life constituted cruel and unusual punishment.  On our own motion, we requested the parties to provide additional briefing on the following issues:  (1) did the trial court err in imposing 15-year terms for the gang use allegations as to counts 1 and 2 instead of a 15-year minimum parole eligibility for those counts; (2) was the evidence sufficient to establish that the attempted murders were deliberate and premeditated; and (3) did the trial court err in failing to instruct the jury sua sponte on provocation?

We conclude the trial court erred in imposing separate 15-year terms for each of counts 1 and 2 under section 186.22, subdivision (b)(5), because the statute instead provides for a minimum parole eligibility term.  We find no further prejudicial errors, and we affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## II.  FACTS AND PROCEDURAL BACKGROUND

### A.  Prosecution Evidence

Edward Inzunza[2] testified that he went to Paragon Park in Perris at around 5:00 p.m. on May 11, 2009, when he was 14 years old, to play handball with his cousin.  His good friend, Jahaziel Reyna, was at the park waiting to play handball when Inzunza arrived.  Reyna was associated with a street gang called Brown Pride Criminals (BPC).

At the park, Inzunza saw Robert Ulloa[3] walk a few feet in front of him while moving toward the driver's door of a white car in the parking lot.  Reyna also went toward the car where three to five of his friends were standing.  Defendant stepped out of the car, and he and Reyna argued.  Reyna punched defendant in the jaw and started running towards the basketball courts.[4]  Defendant did not have a gun in his hands, but he then "shuffled his pockets," although Inzunza could not tell if defendant's hands were inside or outside the pockets.  Inzunza looked away toward Reyna, and he heard two or

---

[2] Inzunza was reluctant to testify and initially refused to answer questions until he was admonished by the trial court.  His testimony was contradictory and confusing on many points, and we have not attempted to set forth all the inconsistencies, although some examples are described herein.

[3] Ulloa was tried as a codefendant in the assault counts and the gang participation count.  The jury found him not guilty.

[4] At trial, Inzunza first testified Reyna and defendant had not argued before Reyna punched defendant.  He then admitted he had told an investigator they had argued first, and his statement to the investigator was true.

three shots.  He saw defendant with a gun in his hand firing it toward the basketball and tennis courts where Reyna had gone.[5]

Inzunza turned and saw defendant pointing a gun three or four inches from his chest.[6]  Inzunza attempted to jump back, and he "hit the gun down."  Right after he hit it, the gun fired.  Inzunza was shot in the right upper thigh and he fell to the ground.  Defendant then fired three more times in the direction Reyna was running.[7]  Defendant then got in the white car and left "fast."

Inzunza was transported to the emergency room, where he received 24 stitches in his leg; he remained in the hospital for three days.  Despite receiving three months of physical therapy, he was still unable to play the sports he had played before the shooting.

Deputy Dario Hernandez of the Riverside County Sheriff's Department arrived at the emergency room to take Inzunza's statement about 10 minutes after Inzunza's arrival there.  Inzunza was scared and nervous, but coherent.  Inzunza said he had been playing handball in the park, and at some point Reyna and the suspect began to argue about something.  Reyna punched the suspect in the face, and the suspect pulled out a handgun.  Everyone in the park started running, and the suspect looked around as though he was

---

[5] Inzunza also testified he had not seen defendant shooting in Reyna's direction.

[6] He also testified he saw defendant shooting toward the basketball and tennis courts, and he saw a gun in defendant's hand.  At another point, he testified he never saw defendant pull out a gun or fire any shots and that he had heard the first three shots, but did not see the shooter until the shooter was pointing the gun at him.

[7] Inzunza later testified he had heard three more shots but did not see who the shooter was.

4

looking for someone to shoot. The suspect then turned around, pointed the gun at Inzunza, and shot him. Reyna came up and asked Inzunza if he was okay and then said, "'Ambulance is on the way,'" and "'I have to go.'" Inzunza said there was an "ongoing issue" between Reyna and the suspect, who were associated with rival gangs or crews. Inzunza did not tell Deputy Hernandez the gun was pointed at his chest or that he had swiped at the gun before its discharge. He did not say the suspect had shot at Reyna at all.

Reyna, who had been deported to Mexico, was found to be unavailable, and his preliminary hearing testimony was read to the jury. At the preliminary hearing, he claimed he did not know where Paragon Park was, and he did not know Inzunza. No one had shot at him; he had been in the restroom when he heard shooting. He had been at the park when some kid had been shot, but he was just waiting to play basketball. He had not seen anyone get out of a car, and he was not involved in the incident. No one pointed a gun at him; he never had to duck; he never saw who was shooting; he never saw who was involved in the fight; he did not see who was shot. He was not familiar with a group called Brown Pride, although he had a tattoo of "Brown Pride" on his arm. He did not belong to a gang and was not familiar with any gangs in Perris. He never had an issue with anyone in a gang. He never told an officer a man had removed a silver gun from his belt, and he denied having said the man had started shooting at him. He never said he thought four shots were fired or that he ran from the park. He had said the kid who was shot was like family to him because they were related, but he only knew his first name.

5

He had not received any threats warning him not to testify. He did not know defendant or Ulloa, and he had never seen them before.

Robert Nicklo, an investigator for the Riverside County District Attorney's office, interviewed Reyna on May 14, 2009. Investigator Nicklo testified that Reyna said he had been at the park playing handball when a white car with three men inside pulled up. The men got out, and the driver approached Reyna and asked him, "'Who the fuck are you?'" Reyna described the driver as a light-skinned Hispanic, approximately five feet seven inches tall, with hair shorter on the sides than on the top, possibly having a mustache, and with a "S" on each inner forearm. Reyna did not identify anyone in a photographic lineup, although he stated one person looked similar to the shooter. He was shown a second photographic lineup two days later, and he identified a person as the shooter.

Reyna initially told Investigator Nicklo he had merely pushed the man before the man took a gun from his waistband and began shooting. The man fired four shots in Reyna's direction while Reyna ran south out of the park. However, Inzunza told the investigator that Reyna had punched Chaira. About six weeks after the incident, Inzunza said he had slapped at the gun, causing it to fire.

Deputy Sheriff Brandon Cardinale found four empty .380-caliber casings, three of which were on the curb near where the white car had been parked. He testified that semiautomatic firearm casings are ejected from the right side of the weapon up to seven feet away. He also found a "bullet strike" mark in a skate park about 100 feet from where Inzunza was found lying. The strike mark was one or two feet from the ground and about 150 feet from the casings. The deputy saw no blood trail near Inzunza, and it

6

therefore appeared Inzunza may have fallen down where he got shot.. From the location of the shell casings, the deputy reasoned the shooter had been standing five to 10 feet away from Inzunza.

Because defendant does not challenge the gang evidence or the gang participation conviction on appeal, evidence supporting that charge is set forth summarily: A gang expert testified that defendant was an active gang member in the Perres Maravilla gang and stated his opinion that defendant's crimes benefited his gang.

## B. Defense Evidence

Defendant testified in his own behalf. He said friends and family members belonged to a gang, but he denied being a gang member himself. On May 11, 2009, he drove to the park and sat in his car a few minutes talking to his wife. He called Ulloa and invited him to play a game of handball. When he got out of his car, "some guys" approached and "they were saying something" to him that he could not hear. He told them he did not want any problems, and when he turned around, "they started hitting [him], jumping [him]." He had his back to them and did not see who hit him first, but it was more than one punch, "like, getting jumped." He was carrying a gun for protection because he had been shot in a drive-by shooting a few months earlier. After he was hit, he turned around to face the attackers and pulled out the gun. He just pointed the gun to scare them and someone hit the gun down, and it went off. He testified that Inzunza was part of the fight. He continued, "Well, when I pulled it out, he hits it. They're still hitting me so I just shot three more times." He shot to the ground, not aiming at anyone, to scare them away. He did not intend to shot Inzunza. The men who approached him

7

did not appear to be gang members, and he did not know why they confronted him. Nothing was said about gangs. He did not know Reyna or Inzunza. He visited the park two or three times a month, and he had never had any problems there before.

Linda Evans, who lived three houses away from the park, had known defendant for about 10 years. On the day of the shooting, she saw a group of men rushing at defendant near the parking lot, and a minute or two later, she heard three pops.

### C. Verdicts and Sentence

The jury found defendant guilty of attempted deliberate and premeditated murder (§§ 664, 187, subd. (a); counts 1 & 2); assault with a firearm (§ 245, subd. (a)(2)); counts 3 & 4) and gang participation (§ 186.22, subd. (a); count 5), and found true various enhancement allegations (§§ 12022.53, subd. (c), 186.22, subd. (b), 12022.53, subd. (d), and 12022.7, subd. (a)).

For count 2, the trial court sentenced defendant to seven years to life, a consecutive term of 25 years to life for the firearm use enhancement (§ 12022.53, subd. (d)), and a consecutive term of 15 years to life for the gang enhancement (§ 186.22, subd. (b)). For count 1, the trial court sentenced defendant to seven years to life, a consecutive term of 15 years to life for the gang enhancement (§ 186.22, subd. (b)), and a consecutive term of 20 years for discharging a firearm (§ 12022.53, subd. (c)). The trial court stayed defendant's sentences on counts 3 through 5 under section 654. The total term was 69 years to life plus 20 years.

8

## III.  DISCUSSION

### A.  Sufficiency of Evidence

Defendant contends his convictions for attempted murder must be reversed because the evidence was insufficient to establish an intent to kill.  We requested the parties to provide additional briefing as to whether the evidence was sufficient to establish premeditation and deliberation.

#### 1.  Standard of Review

When a criminal defendant challenges the sufficiency of the evidence to support his conviction, "'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of sold value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.)  "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  [Citation.]" (*Ibid.*)

#### 2.  Intent

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623.)  "A defendant's intent is rarely susceptible of direct proof, and may be inferred from the facts and circumstances surrounding the offense.  [Citation.]" (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1624.)

9

Defendant argues that the evidence showed "rather clearly" that he "responded to the punch in his face and being surrounded by Reyna's friends by drawing a gun to scare his rivals away. He pointed his gun directly at them, admittedly. And by doing so, he committed assault with a deadly weapon. But had [he] intended to kill the men around him, he easily could have done so. He did not." He further argues the shooting of Inzunza was accidental and was caused by Inzunza's own act of striking the gun away, and that the only shots he fired intentionally were fired into the ground or off into the distance to scare his assailants away. In making those arguments, defendant sets forth the evidence in the light most favorable to his own position on appeal, not in the light most favorable to the jury's verdicts. (*People v. Avila*, *supra*, 46 Cal.4th at p. 701.)

In contrast to defendant's version of the events, other evidence showed that Reyna was running away when defendant pulled out his gun, pointed it towards where Reyna was fleeing, and fired two or three shots at him. Defendant then turned his attention towards Inzunza, who saw the gun pointed at his chest, three or four inches away. Inzunza hit the gun, and defendant shot him before firing off several more shots at Reyna. While at the hospital, Inzunza told Officer Hernandez the suspect stopped, pointed his gun at Inzunza, and shot him in the leg after pointing the gun at his chest, although at trial he denied that version of the events. Investigator Nicklo testified that Reyna had stated the bullets had been fired "at him" as he ran. The gang expert testified to his opinion that a gang member would benefit his own gang and his status within the gang by attempting to kill a member of a rival gang.

10

Thus, under the version of the events most favorable to the jury's verdict, defendant fired multiple shots, in two separate bursts, toward where Reyna was running, and he fired a shot toward Inzunza at close range, although Inzunza deflected the trajectory of the shot from his chest to his thigh. We conclude ample evidence supports the finding of intent to kill.

### 3. Premeditation and Deliberation

Premeditation requires that the defendant acted as "the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed . . . .'" (*People v. Anderson* (1968) 70 Cal.2d 15, 27.) In that case, the court listed three nonexclusive factors to consider in determining the sufficiency of the evidence of premeditation and deliberation: motive, planning activity, and the manner of killing. (*Id.* at pp. 26-27; see also *People v. Stitely* (2005) 35 Cal.4th 514, 543.)

As to the factor of motive, Inzunza testified defendant and Reyna had an "ongoing issue," and the two men were associated with rival gangs or crews. As to the factor of planning activity, defendant was armed with a loaded gun when he arrived at the park. As to the third factor, defendant pointed his gun toward Inzunza's chest from a distance of only a few feet, although Inzunza hit the gun down, and the shot struck his thigh instead of his chest. Firing a shot (or in this case, aiming a shot) at a vital area of the victim's body indicates a deliberate intent to kill. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1082.) Moreover, the fact that defendant fired at Reyna in two separate bursts indicates he had an opportunity to reflect, but nonetheless continued firing. (See, e.g.,

11

*People v. Houston* (2012) 54 Cal.4th 1186, 1216 ["'"the process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. . . .'"'"].)

Considered in the light most favorable to the verdict, the evidence supports the jury's finding of premeditation and deliberation.

**B. Jury Instructions**

We requested the parties to provide additional briefing on the issue of whether the trial court erred in failing to instruct the jury sua sponte on provocation.

*1. Analysis*

The trial court must instruct the jury sua sponte on general principles of law relevant to the issues raised by the evidence. (*People v. Verdugo* (2010) 50 Cal.4th 263, 293.) We review de novo whether the trial court erred in failing to instruct on a lesser included offense. (*Ibid.*) Attempted voluntary manslaughter is a lesser included offense of attempted murder. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.)

CALCRIM No. 603 provides in part, "An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone because of a sudden quarrel or in the heat of passion. [¶] The defendant attempted to kill someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant took at least one direct but ineffective step toward killing a person; [¶] 2. The defendant intended to kill that person; [¶] 3. The defendant attempted the killing because (he/she) was provoked; [¶] 4. The provocation would have caused a person of average disposition to act rashly and without due deliberation,

12

that is, from passion rather than from judgment;  [¶]  AND  [¶]  5.  The attempted killing was a rash act done under the influence of intense emotion that obscured the defendant's reasoning or judgment."

The Bench Notes to CALJIC No. 603 state:  "The court has a **sua sponte** duty to instruct on . . . heat of passion . . . when evidence [supporting that theory] is 'substantial enough to merit consideration' by the jury.  (See *People v. Breverman* (1998) 19 Cal.4th 142, 153-163 . . . [discussing charge of completed murder]; *People v. Barton* (1995) 12 Cal.4th 186, 201 . . . [same].)"  (Boldface in original.)

In deciding whether the evidence supports an instruction, the court does not evaluate the credibility of witnesses.  (See *People v. Breverman* (1998) 19 Cal.4th 142, 162.)  No specific type of provocation is required, and verbal provocation may be sufficient.  (*People v. Wickersham* (1982) 32 Cal.3d 307, 326, disapproved on another ground in *People v. Barton*, *supra*, 12 Cal.4th at p. 201.)  California courts have long recognized that a blow with the fist that causes substantial pain or injury may be sufficient provocation.  (*People v. Elmore* (1914) 167 Cal. 205, 211; see also *People v. Whitfield* (1968) 259 Cal.App.2d 605, 609-610.)

Here, Evans testified she saw a group of men rushing at defendant near the parking lot minutes before she heard three pops.  Defendant testified a group of men confronted him when he got out of his car, and he told them he did not want any problems.  He did not pull out his gun until after someone punched him, and other men continued to hit him while he fired the gun toward the ground.

13

In *People v. Moye* (2009) 47 Cal.4th 537, the defendant contended the trial court had erred in failing to instruct the jury on voluntary manslaughter under a theory of sudden quarrel or heat of passion. The jury had been instructed on justifiable homicide based on reasonable self-defense and on manslaughter based on imperfect self-defense, but had found the jury guilty of second degree murder. (*Id.* at pp. 541-542.) The court held that even assuming instructional error, "the jury having rejected the factual basis for the claims of reasonable and unreasonable self-defense, it is not reasonably probable the jury would have found the requisite *objective* component of a heat of passion defense (legally sufficient provocation) even had it been instructed on that theory of voluntary manslaughter." (*Id.* at p. 558.) Here, as in *Moye*, the jury was instructed on both perfect and imperfect self-defense and defense of another, but the jury rejected both theories. We therefore conclude, as did the *Moye* court, that even if the trial court erred in failing to instruct on provocation, the error was necessarily harmless. (*Ibid.*)

## C. Correction of Sentence

On our own motion, we requested the parties to provide additional briefing as to whether the trial court's imposition of a separate 15-year term for each of counts 1 and 2 under section 186.22, subdivision (b)(5) was unauthorized. The People have conceded that the statute provides for a minimum parole eligibility term rather than a determinate consecutive enhancement. (See, e.g., *People v. Harper* (2003) 109 Cal.App.4th 520, 525-526.) Because the sentence imposed was unauthorized, we will correct it on appeal by striking the enhancement terms and ordering the abstract of judgment to be amended accordingly. (See *People v. Smith* (2001) 24 Cal.4th 849, 853.)

14

**D. Constitutionality of Punishment**

Defendant contends his sentence constituted cruel and unusual punishment. We first note that we have modified defendant's sentence to 39 years to life plus 20, and defendant's challenge is therefore arguably moot. We will nonetheless exercise our discretion to address the issue on the merits.

*1. Standard of Review*

"'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment. [Citations.]' [Citation.]" (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358.)

*2. Analysis*

The Eighth and Fourteenth Amendments to the United States Constitution prohibit cruel and unusual punishment, and the United States Supreme Court has held that a criminal sentence is cruel and unusual if it is grossly disproportionate to the crime for which the defendant was convicted. (*Graham v. Florida* (2010) 560 U.S. __ [130 S.Ct. 2011, 2021-2022] (*Graham*).) The state Constitution similarly bans cruel or unusual punishment. (Cal. Const., art. 1, § 17.) A punishment may violate the California Constitution if "'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' [Citation.]" (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 199.) The defendant bears the burden of establishing that his sentence was unconstitutional. (*People v. King* (1993) 16 Cal.App.4th 567, 572.) The court considers three factors in determining whether a

15

defendant's punishment violates the state constitution. (*In re Lynch* (1972) 8 Cal.3d 410, 424; *People v. Dillon* (1983) 34 Cal.3d 441, 487-488.) First, the court examines the "nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*In re Lynch*, *supra*, at p. 425.) Second, the court compares the challenged punishment with punishments for more serious crimes in the same jurisdiction. (*Id.* at pp. 426-427.) Third, the court compares the challenged punishment with punishments for the same offense in other jurisdictions. (*Id.* at pp. 427-429.)

(a) Nature of offense and offender

Defendant committed not just one offense, but five: two counts of attempted premeditated and deliberate murder, two counts of assault with a deadly weapon, and one count of gang participation. In committing those offenses, he personally used a firearm, and he inflicted serious injury on one of the victims. With respect to the nature of the offenses, our Legislature has defined as serious felonies "(8) any felony in which the defendant personally inflicts great bodily injury on any person . . ."; "(9) attempted murder"; and "(23) any felony in which the defendant personally used a dangerous or deadly weapon." (§ 1192.7, subd. (c)(1).)

With respect to the nature of the offender, the probation report indicates defendant's criminal history began in 2002; he was then 17 years old when a petition alleging felony possession of a controlled substance (Health & Saf. Code, § 11378) and misdemeanor possession of drug paraphernalia (Health & Saf. Code, § 11364) was sustained in juvenile court.

16

In 2003, he was convicted as an adult of misdemeanor possession of a controlled substance (Health & Saf. Code, § 11375, subd. (b)(2)); misdemeanor identity theft (Pen. Code, § 530.5, subd. (d)); two counts of possession of a firearm by a felon (Pen. Code, former § 12020, subd. (a)(1); now see § 29800, subd. (a)(1), added by Stats. 2010, ch. 711, § 6)); receiving stolen property (Pen. Code, § 496, subd. (a)); receiving a stolen vehicle (Pen. Code, § 496d, subd. (a)); felony possession of controlled substance (Health & Saf. Code, § 11377, subd. (a)); and failure to appear (Pen. Code, § 853.7). That year, he also violated probation.

In 2004, in four separate cases, he sustained felony convictions for possession of marijuana for sale (Health & Saf. Code, § 11359), three counts of possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)), receiving stolen property (Pen. Code, § 496, subd. (a)), and a misdemeanor conviction for driving under the influence (Veh. Code, § 23152, subd. (a).) Two of his offenses were committed while he was on bail (Pen. Code, § 12022.1), and that year, he also violated probation. He was sentenced to 40 months in prison.

In 2010, he sustained a felony conviction for receiving stolen property. At the time he was convicted of the current offenses, he had an open case alleging assault with a deadly weapon (§ 245, subd. (a)(1) and felony vandalism (§ 594, subd. (b)(1)), although those charges were dismissed in the interest of justice at defendant's sentencing hearing. Defendant's extensive prior criminal history and the nature of his current offenses indicate he is unable or unwilling to conform his conduct to social norms and thus poses a significant danger to society. (*In re Lynch*, *supra*, 8 Cal.3d at p. 425.)

17

(b)  Comparison with other punishments

Because defendant "does not base his disproportionality contention on a comparison of punishments, we decline to engage in such a comparison."  (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 846.)

We conclude that defendant's corrected sentence, although harsh, passes constitutional muster.

## IV.  DISPOSITION

The trial court is ordered to amend the minute order of the sentencing hearing to reflect that defendant's sentence for counts 1 and 2 is subject to a 15-year minimum parole eligibility term rather than a separate determinate enhancement and to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

RICHLI
J.

KING
J.

18