Filed 6/17/22  P. v. Bratton CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DENNIS JOHN BRATTON,<br><br>    Defendant and Appellant. | F076969<br><br>(Super. Ct. No. BF153011A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Michelle May Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In May 2013 appellant Dennis Bratton was serving a life sentence in prison with the possibility of parole[1] when he beat to death his cellmate, Andrew Keel. A jury convicted appellant of aggravated assault by a life prisoner (Pen. Code, § 4500;[2] count 1). He was sentenced to life without the possibility of parole (LWOP), plus enhancements of 15 years.[3]

Appellant contends that multiple instructional errors occurred. He asserts that California law is flawed regarding certain aspects of self-defense, imperfect self-defense and voluntary manslaughter. He also argues that the trial court should not have instructed the jury on the doctrine of mutual combat. We reject these claims. However, we agree with the parties that the trial court improperly imposed a suspended parole revocation fine (§ 1202.45). We modify the judgment to strike that fine, but otherwise affirm.

## BACKGROUND

When this homicide occurred, appellant and Keel[4] were cellmates at Kern Valley State Prison, a level IV maximum security prison. Appellant and Keel chose to live together, and they had resided in the same cell for about seven months. At trial, appellant told the jury that Keel had been his friend. According to appellant, Keel had been a good cellmate.

---

[1]    In 1997, appellant received a determinate prison term of 34 years eight months and a consecutive indeterminate prison term of seven years to life for attempted first degree murder, along with convictions from other felony charges.

[2]    All future statutory references are to the Penal Code unless otherwise noted.

[3]    This sentence was to be served consecutively to the indeterminate term appellant was already serving when this crime occurred. During the penalty phase in this matter, the jury was deadlocked and a mistrial was declared. The prosecution elected not to retry the penalty phase.

[4]    Keel's nickname was "Spider." The reporter's transcript alternatively spells Keel's nickname as "Spider" or "Spyder."

Both at trial and in the present appeal, appellant admits that he killed Keel. During opening statements below, the defense conceded that appellant had killed Keel using his hands and feet, and it was bloody. The jury learned that Keel had been badly beaten inside the cell he shared with appellant. Keel died as a result of blunt force trauma to his head. He had multiple fractures to his skull and forehead, and one of his eyes was detached. Keel had aspirated blood in his lungs. He had a postmortem ligature injury to his neck, and the thyroid cartilage in his neck was fractured.

An inmate, James Fortini, lived in an adjoining cell and he heard portions of the fatal incident. In general, however, it was appellant who provided details about the killing.

During closing argument, appellant's trial counsel primarily asserted that appellant had acted in self-defense. According to the defense, Keel had threatened appellant's life, and appellant had responded to that provocation. The defense asked the jury to find appellant not guilty.

## I. Appellant's Prior Prison Assault.

The jury learned that this was not the first beating appellant had administered on a fellow inmate. In 2010, about three years before this fatal incident, appellant assaulted an inmate while they were on the prison yard. Appellant slammed the prior victim to the ground and, while this victim was nonresponsive, appellant repeatedly stomped on his head. Appellant rendered this prior victim critically injured with a depressed skull fracture and multiple facial injuries. A treating physician testified that this victim suffered life threatening injuries, which required surgery to relieve swelling around the brain.

Appellant told the jury that this prior victim was a sex offender. According to appellant, he had attacked this victim after the victim had made sexual gestures towards him. In February 2011, appellant received a felony conviction for this prior assault.

3.

## II.    The Assault on Keel.

Appellant killed Keel on the morning of May 16, 2013.  By all accounts, that morning started normally.  Appellant and Keel were served breakfast in their cell at around 6:30 or 6:45 a.m.  Their breakfast trays were picked up around 7:00 a.m. or shortly thereafter.  No problems were seen at that time.

Appellant typically worked as part of the prison yard crew.  He would normally be released from his cell sometime between 8:00 and 8:30 a.m.  Because he worked on the yard, appellant had state-issued work boots, which had a hard sole.  On the morning in question, appellant was wearing his boots.

At around 8:30 a.m. on the morning in question, appellant was told that he would not be released for work right away because some of the correctional officers had training that morning.  Around that time, some of the correctional officers in that area of the prison left for training.  According to a correctional officer, appellant and Keel were in their cell at about 8:30 a.m. that morning, and everything appeared okay.

Appellant testified that, after being told he would not be released for work, he continued to wear his work clothes, including his boots, because he anticipated being called out to work in the yard once the training ended later that morning.

### A.    *Appellant and Keel exchange words.*

It is undisputed that Keel was very inebriated when he was killed.  Just prior to the fatal incident with appellant, Keel had been drinking prison-made alcohol.[5]  His blood-alcohol content at the time of his autopsy was at least two and a half times the legal driving limit.

According to appellant, the incident started when he turned down his radio in their cell.  Keel complained that he had been listening to a song.  They had a verbal exchange

---

[5]    The trial evidence was in conflict regarding how Keel obtained the prison-made alcohol, which is known as "pruno."  We need not summarize that disputed evidence, which is immaterial to the issues raised on appeal.

and then Keel said, "[B]oy, you think you're a tough guy, don't you?" Appellant responded, "[H]ere we go." This seemed to anger Keel, who said, "No, I'm serious."

Appellant told the jury that he believed Keel was drunk and acting out of character. Keel gave him dirty looks and said he would "bounce" appellant "off everything in this cell." Appellant testified that this was "a normal prison threat." They had eye contact and a lot of tension. Appellant claimed at trial that he told Keel to calm down and stop drinking.

### B.     *The first exchange of blows.*

According to appellant, Keel got into a fighting stance. Appellant asked Keel if he was "serious" and if he really wanted "to do this." Keel said, "[Y]eah, come on." Appellant told him, "[Y]ou know, you're going to lose, right?" Keel said, "[C]ome on, motherfucker, come on." Appellant moved towards him and Keel threw the first punch. They exchanged punches and appellant knocked Keel to the ground.

Appellant testified that Keel did not know how to fight very well, and appellant was confident he was going to win. Appellant felt that he was the better fighter.[6]

### C.     *The alleged threat on appellant's life.*

According to appellant, Keel's nose "was busted" and "leaking bad" after their first exchange of blows. Appellant asked Keel if he was done and had enough. Keel was dazed, but he cursed at appellant and indicated that he wanted to fight more. Keel began to remove a piece of drawstring from a pair of his shorts. He told appellant, "[Y]ou got to sleep sometime." Appellant was sitting on his bed at the time. He asked Keel if that was supposed to be a threat. Keel finished cutting the string from the shorts and he

---

[6]     Fortini, an inmate in a neighboring cell, testified that he heard what sounded like a fight based on scuffling sounds. He heard someone in appellant's cell say, "Come on, Bro. That's it." Someone else said, "Yeah, you ain't going to keep talking shit." Fortini assumed Keel said the former and appellant the latter because of "how it turned out after."

started to turn around. Appellant stood up and moved towards him. As Keel was turning around, he told appellant he would "cut" his throat and "fuck" him.[7]

Appellant told the jury that he viewed the drawstring as a potential weapon. He took it as a threat to his life when Keel said appellant had to sleep sometime. Appellant feared that Keel would later try a "sneak attack" on him, which was common in prison when somebody was unable to win a fight. Appellant testified that Keel "elevated" the situation "by making threats about doing something to me while I was asleep, about cutting my throat."

### D.     *Appellant renders Keel unconscious.*

After Keel made his threat, appellant took a fighting stance and Keel tried to tackle him. Keel ended up on the ground on his back and appellant kicked his face with his boot, possibly five or six times. According to appellant, Keel's head was bouncing off the cement floor, and Keel was rendered unconscious. At some point, however, Keel regained consciousness and he sat up. He vomited and managed to stand up. Appellant told Keel to pack because he was going to move to a new cell. Keel said, "[F]uck you. I ain't going nowhere."

### E.     *The final blows.*

Appellant testified that, after Keel said he was not going to move, appellant punched him hard on the chin. Keel fell and he ended up face down on the ground. Appellant stomped on and kicked Keel's head about seven or eight times. Appellant told the jury that, at that point, he wanted to end the situation because Keel would not stop getting up. Appellant said he was "going to make sure he's hurt, that he's leaving and this situation is over." However, appellant claimed he did not want to kill Keel.

---

**7**     Before living together in that cell, Keel had disclosed to appellant that he (Keel) had previously "sliced" an inmate's throat at a prior prison because that inmate had not participated in a race riot. During closing arguments, appellant's trial counsel asserted that the jurors should consider that fact in deciding if appellant's conduct was reasonable.

6.

Appellant took a cord and placed it around Keel's neck.  Appellant pulled up so that Keel's head and chest were lifted off the ground.[8]  Keel was limp when appellant pulled him up with the cord.  At trial, appellant agreed that he left the ligature marks on Keel's neck.  He agreed that, around that time, he could "kind of tell" that Keel was dead.

### F.    Appellant's explanation of his actions to the jury.

At trial, appellant thought that the whole incident lasted about five or 10 minutes.  He told the jury that he tried to calm the situation down throughout the entire encounter.  He believed he told Keel about 10 times to "knock it off."  Appellant testified that it was not really an option to just sit down and ask Keel to talk about it.  According to appellant, it was also not possible to just call for help inside the cell.  Appellant said he had already tried to calm Keel down but Keel kept "escalating" the situation.

When asked why he did not seek help from a guard after Keel had threatened him, appellant said he could not just wait and tell a correctional officer because he would be labeled a "rat" and he would "have a target on my back for the rest of my life."  In addition, he would still be in the cell with Keel all day, and appellant was concerned that Keel could get "the upper hand" on him.

Appellant told the jury that a person cannot back down in prison or show "any weakness."  He testified that, when "somebody calls you out" in prison "you have to accept the challenge."  He said prison is "a masculine society" and a "warrior mentality" exists.  If somebody calls you out, you will look weak if you do not do anything.

At trial, appellant denied planning to kill Keel.  He denied ever telling anyone else that he had planned to hurt or kill Keel in the days leading up to this.  He denied planning to kill Keel when the officers were at training.

---

**8**    A string or cord recovered inside the cell was consistent with the ligature marks seen on Keel's neck.

7.

**III.    Appellant Calls for Help and Sends Some of his Personal Property to Fortini Next Door.**

At some point after rendering Keel unconscious, appellant alerted correctional officers that Keel needed help by calling "man down." However, an evidentiary conflict exists regarding how much time passed before appellant began calling for help. According to Fortini (the neighbor), about 20 minutes "at the most" passed from the time he heard banging noises cease in appellant's cell until appellant began calling "man down." Fortini believed it took another five or 10 minutes before an officer responded and an alarm activated.

In contrast, appellant testified that he began to call "man down" right away, but he admitted he may have waited a "minute or two" after the fight ended to start calling. He claimed he yelled sporadically for about 20 minutes before a correctional officer responded to the cell. Appellant explained that he did not call for help sooner during the violent encounter because Keel had been continuously aggressive and threatening.

Appellant told the jury that, after the fight ended, he knew he was going to be segregated in "the hole." During the approximate 20-minute period before a correctional officer responded, appellant sent some of his personal property, such as his wristwatch and CD's, over to Fortini.[9] Appellant took off his work boots and he put on sneakers. Appellant told the jury that he realized his actions sounded "cold" because Keel was lying unresponsive on the floor and dying (or already dead) but "that's how our minds operate in prison." He said it was normal for a prisoner headed to the hole to want to protect his personal property.

---

[9]    The trial evidence was in conflict regarding whether or not appellant admitted to Fortini that he (appellant) had killed Keel. According to Fortini, appellant sent him a written message (called a "kite") just after the fatal incident, and the message stated that appellant had killed Keel. Fortini told the jury that he had flushed the alleged written message from appellant down the toilet. In contrast, appellant denied ever sending Fortini a written message stating he had killed Keel.

## IV.    Correctional Officers Respond.

At about 9:23 a.m. an officer responded to appellant's calls for help.  Appellant told the responding officer that Keel was dead and nothing could be done for him.  Appellant appeared very calm and he was not sweating.  He did not appear injured.  Keel was lying face down in a pool of blood.  He was not moving and he did not appear to be breathing.

Multiple officers responded to an alarm at approximately 9:23 a.m.  Appellant was removed from his cell without incident.  When medical personnel tended to Keel in the cell, he was face down, not breathing, nonresponsive, and there was "massive pooling of blood on the floor."  Keel had no pulse and he was cold.  Keel was transported to a hospital, where he was pronounced dead at 10:20 a.m. that same morning.

The responding officers all agreed at trial that, after appellant was removed from his cell, he had appeared very calm.  He was not sweating or out of breath.  Multiple officers heard appellant say words to the effect that Keel was dead and it was pointless to render medical aid to him.

Photographs were taken of appellant shortly after he was removed from his cell.  He did not appear to have any injuries.  However, he did have bruises on his heels and knees.  Appellant did not appear intoxicated.

At trial, appellant agreed with the officers' general testimony that he had appeared calm or cold after being removed from his cell.  He told the jury he does not get very emotional and he lives in a violent world.  As a result, you do not show emotion in prison.  However, appellant claimed to the jury that he was upset about what had happened because Keel had been his friend.  Appellant told the jury that, because inmates do not talk to law enforcement, he did not share with the officers that day what had happened in the cell with Keel.

9.

## V.     The Testimony from Inmates.

During its case-in-chief, the prosecution called four inmates to testify against appellant.[10]  Fortini (the neighbor) claimed at trial that, about three or four days before this homicide, he had heard appellant say in the dayroom that he was going to hurt Keel. Fortini also claimed that, either a few days before this killing or even the night before, he had heard someone in appellant's cell ask a correctional officer for permission to change to a new cell, and the officer had responded, "I don't see a body."[11]  According to Fortini, appellant and Keel were not getting along.  Fortini, however, previously informed law enforcement that neither appellant nor Keel had ever talked to him about " 'not getting along.' "  At trial, he said his previous statement to law enforcement had been a lie.[12]

Inmates Aaron Yost and Mario Anthony Melchionne both testified that they separately spoke with appellant months after this killing.  According to Yost, appellant said that Keel "was a coward" and "he was a bitch."  Appellant said that Keel was "using drugs" behind appellant's back.  Appellant told Yost "it was over fast."  Appellant said

---

**10**     In general, the credibility of the four inmate witnesses was impeached in various ways.  In his opening brief, appellant extensively details the credibility concerns surrounding these inmates, including attempts to obtain favorable treatment from the government.  We need not summarize in depth the various credibility issues surrounding the incarcerated witnesses.  Instead, it was the jury's role to determine witness credibility, and the truth or falsity of the determinative facts.  (§ 1127; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.)

**11**     At trial, the officer in question denied that he had received a request from either appellant or Keel for a cell change in the days leading up to this homicide.

**12**     At trial, Fortini also claimed he had worked with Keel as a prison porter. However, the defense impeached Fortini with information from prison records which purported to show that Fortini had not worked as a porter until after Keel was killed.

he had been yelling for a guard, but nobody heard him. Keel "was spitting and coughing up blood." Appellant decided to "end it" so he stomped on Keel's head.[13]

According to Melchionne, appellant said Keel had been "going through his shit" and Keel had been "acting like a nigger."[14] Appellant "got fed up" with Keel so he decided to kill him.

At trial, appellant denied ever referring to Keel as a "nigger," and he denied Melchionne's testimony. According to appellant, he told Melchionne that Keel "was drunk and talking shit." He denied telling Melchionne or anyone else that Keel was ingesting drugs without him. When asked at trial why he did not share with Yost or Melchionne what had really happened, appellant said an inmate does not "go into specifics" about something like this.

## DISCUSSION

### I.    Instructional Error Did Not Occur with CALCRIM Nos. 505 and 571.

Appellant was convicted in count 1 of violating section 4500. In relevant part, this statute reads: "Every person while undergoing a life sentence, who is sentenced to state prison within this state, and who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death or life imprisonment without possibility of parole." Because section 4500 involves "malice aforethought," both perfect and imperfect self-defense may be raised. (See *People v. St. Martin* (1970) 1 Cal.3d 524, 530–531 [in a prosecution under section 4500 it is error to refuse an instruction on provocation]; see also Bench Notes to CALCRIM No. 2720.)

---

**13**    In August 2014, Yost was attacked by two prison inmates. In September 2014, law enforcement intercepted a written message from appellant asking certain inmates to attack Fortini, and alerting them that Yost was cooperating with authorities.

**14**    Keel was Caucasian. According to Melchionne, appellant's comment about Keel had meant that Keel had been "listening to rap music" and wearing "sagging" pants.

Appellant raises two separate but related claims of instructional error, which we address together. He contends that portions of both CALCRIM No. 505 (perfect self-defense) and CALCRIM No. 571 (imperfect self-defense) are erroneous, especially when applied to his situation as a confined prisoner who received a potential death threat from a cellmate. He argues that these instructions lowered the prosecution's burden of proof and resulted in federal constitutional error.

## A.    *Background.*

Based on CALCRIM No. 505, the trial court instructed the jurors that appellant was not guilty if he acted in self-defense.[15] We highlight in bold the disputed language from CALCRIM No. 505 which appellant challenges on appeal.

In relevant part, the jurors were told that, for self-defense to apply, appellant (1) must have reasonably believed he was "in imminent danger" of being killed or suffering great bodily injury, or he was "in imminent danger" of being raped; (2) he must have reasonably believed "**immediate use** of deadly force" was necessary to defend against that danger; and (3) he used no more force than was reasonably necessary to

---

[15]    For comparison, CALJIC No. 5.12 instructs as follows regarding self-defense:

"The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes:

1.  That there is imminent danger that the other person will either kill [him] [her] or cause [him] [her] great bodily injury; and

2.  That it is necessary under the circumstances for [him] [her] to use in self-defense force or means that might cause the death of the other person for the purpose of avoiding death or great bodily injury to [himself] [herself].

A bare fear of death or great bodily injury is not sufficient to justify a homicide. To justify taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of those fears alone. The danger must be apparent, present, immediate and instantly dealt with, or must so appear at the time to the slayer as a reasonable person, and the killing must be done under a well-founded belief that it is necessary to save one's self from death or great bodily harm."

defend against that danger. The jurors were cautioned that a "**[b]elief in future harm is not sufficient** no matter how great or how likely the harm is believed to be. [Appellant] must have believed there was imminent danger of death or great bodily injury to himself." The jurors were told "consider all [of] the circumstances as they were known to or appeared" to appellant and "consider what a reasonable person in a similar situation with similar knowledge would have believed. If [appellant's] beliefs were reasonable, the danger does not need to have actually existed."

Based on CALCRIM No. 571, the trial court instructed the jurors that appellant's crime would be reduced to voluntary manslaughter if he killed Keel because he acted in imperfect self-defense.[16] The jurors were reminded that, if they concluded appellant had acted in complete self-defense, his action was lawful and he must be found not guilty of any crime. The court stated that the difference between complete self-defense and imperfect self-defense depends on whether appellant's belief in the need to use deadly force was reasonable.

---

[16] For comparison, CALJIC No. 5.17 instructs as follows regarding imperfect self-defense:

"A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of [voluntary] [or] [involuntary] manslaughter.

As used in this instruction, an 'imminent' [peril] [or] [danger] means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.

[However, this principle is not available, and malice aforethought is not negated, if the defendant by [his] [her] [unlawful] [or] [wrongful] conduct created the circumstances which legally justified [his] [her] adversary's [use of force], [attack] [or] [pursuit].]

[This principle applies equally to a person who kills in purported self-defense or purported defense of another person.]"

We highlight in bold the disputed language from CALCRIM No. 571 which appellant challenges on appeal. In relevant part, the jurors were told that, for imperfect self-defense to apply, appellant had to (1) actually believe he was "in imminent danger" of being killed or suffering great bodily injury; and (2) actually believe that the **"immediate use** of deadly force was necessary" to defend against the danger; but (3) at least one of those beliefs was unreasonable. The jurors were told that a **belief in future harm** is not sufficient no matter how great or how likely the harm is believed to be. The jurors were told to consider all of the circumstances that were known and appeared to appellant. "A danger is imminent if when the fatal wound occurred the danger actually existed or [appellant] believed that it existed. The danger must seem **immediate and present** so that it must be **instantly dealt with**. **It may not be merely prospective or in the near future**."[17]

## B. Standard of review.

A de novo review is used to analyze a claim of instructional error. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We must review the wording of the jury instruction and assess whether it accurately states the law. (*Ibid.*) We must consider whether a reasonable likelihood exists that the challenged instruction "caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*Ibid.*)

---

[17]    Appellant notes that the trial court misspoke at times when reading the jury instructions. Appellant does not challenge those oral errors because the record suggests that the written instructions were provided to the jury during deliberations. Where disagreement exists between oral and written jury instructions, it is presumed that the jury was guided by the written version. (*People v. Osband* (1996) 13 Cal.4th 622, 687.)

14.

## C.    Analysis.

Appellant maintains that "necessity" is the basis of any self-defense.  He notes that he was locked in a cell with Keel, and he had no way of retreating or escaping.  Keel had previously sliced another inmate's throat for not participating in a race riot at another prison.  Appellant argues that Keel threatened to kill him when he was asleep (or impliedly whenever he let down his guard), and appellant took this threat seriously.  According to appellant, the evidence established either perfect or imperfect self-defense because he held a perception of imminent danger, even if the threat of harm was in the future.  He maintains that an "imminent danger" can include a threat of future harm, especially if a defendant cannot escape the situation.  He claims that the allegedly erroneous portions of CALCRIM Nos. 505 and 571 prevented any realistic opportunity of establishing either perfect or imperfect self-defense in his situation.

We reject appellant's arguments and conclude that instructional error did not occur.  We first address the parties' dispute regarding forfeiture.

### 1.    We decline to find forfeiture.

During the instructional conference, the trial court stated it was going to instruct the jury with CALCRIM Nos. 505 and 571 regarding the doctrines of perfect and imperfect self-defense.  The court invited the parties to make comments.  Appellant did not object to the language contained in these instructions which he now challenges on appeal.  As a result, respondent asks us to not review these claims because appellant did not request clarification or amplification of either CALCRIM No. 505 or 571.

To overcome forfeiture, appellant cites section 1259, which permits an appellate court to review any instruction given despite a lack of objection below "if the substantial rights of the defendant were affected thereby."  Appellant also contends that the trial court had a sua sponte duty to provide correct statements of law, and appellant takes the position that both CALCRIM Nos. 505 and 571 are defective. Finally, appellant raises ineffective assistance of counsel.

15.

We decline to find forfeiture. According to appellant, portions of CALCRIM Nos. 505 and 571 are incorrect as a matter of law. Appellant also argues that these allegedly erroneous instructions "effectively lowered the prosecution's burden of proof." If appellant is correct, these alleged legal errors would impact his substantial rights. As such, these claims are cognizable despite his failure to object below. (See *People v. Kelly* (2007) 42 Cal.4th 763, 791; *People v. Smithey* (1999) 20 Cal.4th 936, 976–977, fn. 7.)

Likewise, we decline to estop appellant based on the doctrine of invited error. This doctrine precludes a party from asserting an error that he or she induced. (*People v. Perez* (1979) 23 Cal.3d 545, 549–550, fn. 3.) However, this doctrine does not apply to bar a criminal defendant from contesting an erroneous instruction even when requested by the defense. As the California Supreme Court has explained, a trial attorney's failure to detect a flaw in standard jury instructions and request a modification does not demonstrate a tactical intent to induce the error subsequently raised on appeal. (*People v. Moore* (2011) 51 Cal.4th 386, 410.) Thus, we will review the merits of appellant's claims.[18] However, we find no error.

### 2. *Instructional error did not occur.*

There are two types of self-defense: perfect and imperfect. (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.) Perfect self-defense requires a defendant to have an honest and reasonable belief in the need to defend himself or another, while imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury. (*Ibid.*) Both perfect and imperfect self-defense require a defendant to fear an "imminent harm." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*).) A fear of "future

---

[18] Because we will review the merits of appellant's arguments, it is unnecessary to consider appellant's claim of ineffective assistance of counsel. (See *People v. Smithey*, *supra*, 20 Cal.4th at pp. 976–977, fn. 7.)

harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." (*In re Christian S.* (1994) 7 Cal.4th 768, 783 (*Christian S.*).)

The word "imminent" appears in section 197, which codifies justifiable homicide in California. First enacted in 1872, the current version states in relevant part that a homicide is justifiable when committed in the lawful defense of a person when there is "reasonable ground" to believe a felony or some great bodily injury may occur, and "imminent danger" exists.[19] (§ 197, subd. (3).) The word "immediate" does not appear in section 197.

Appellant focuses on the differences between the definitions of "imminent" and "immediate."[20] He concedes that CALCRIM Nos. 505 and 571 properly include the word "imminent" in its instructions regarding perfect and imperfect self-defense. However, he maintains that it is improper to require a risk of "immediate" danger, which does not appear in section 197.

We hold that instructional error did not occur in this matter. It was the California Supreme Court that articulated the disputed language that appears in both CALCRIM Nos. 505 and 571.[21] In 1994, our Supreme Court reaffirmed the doctrine of imperfect

---

[19]     Section 192 codifies manslaughter in California. First enacted in 1872, the current version states (in relevant part) that "[m]anslaughter is the unlawful killing of a human being without malice." There are three kinds, including voluntary, which is based "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).)

[20]     The word "imminent" means "ready to take place" or "happening soon" or "often used of something bad or dangerous seen as menacingly near." (<https://www.merriam-webster.com/dictionary/imminent> [as of June 6, 2022].) The word "immediate" means "occurring, acting, or accomplished without loss or interval of time" or "near to or related to the present" or "of or relating to the here and now" or "existing without intervening space or substance" or "being near at hand." (<https://merriam-webster.com/dictionary/immediate> [as of June 6, 2022].)

[21]     A panel from this court has already upheld the language contained in both CALCRIM Nos. 505 and 571. (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1306 (*Lopez*).) In *Lopez*, this court previously stated that "[t]here is no reasonable likelihood

self-defense after the Legislature amended the Penal Code to eliminate the diminished capacity defense.  (*Christian S.*, *supra*, 7 Cal.4th at p. 771.)  The court, however, cautioned that the doctrine of imperfect self-defense is narrow.  "It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. We also emphasize what should be obvious.  Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury.  ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future.  *An imminent peril is one that, from appearances, must be instantly dealt with.*" …  [¶]  This definition of imminence reflects the great value our society places on human life.'  [Citation.]  Put simply, the trier of fact must find an *actual* fear of an *imminent* harm.  Without this finding, imperfect self-defense is no defense."  (*Id.* at p. 783.)

In 1996, our Supreme Court reiterated the requirement that a threat of "future harm" was never sufficient to support any self-defense.  (*Humphrey*, *supra*, 13 Cal.4th at p. 1082.)  The court stated that "for either perfect or imperfect self-defense, the fear must be of imminent harm."[22]  (*Humphrey*, at p. 1082.)

Appellant asks us to disregard the language previously articulated by our Supreme Court.  According to appellant, the high court has never analyzed the unique situation

---

jurors would fail to understand the difference between imminent danger and future harm, one being immediate and the other not."  (*Id.* at p. 1306.)  Appellant argues that *Lopez* is factually distinguishable from the present matter and is inapplicable.  We need not address *Lopez* in depth because we rely on prior pronouncements from the Supreme Court to resolve appellant's claims.

**22**     Our high court continues to reaffirm the requirement that a defendant must face an imminent danger, and a fear of future harm fails to support a theory of self-defense.  (See *People v. Steskal* (2021) 11 Cal.5th 332, 346; *People v. Trujeque* (2015) 61 Cal.4th 227, 270; *People v. Manriquez* (2005) 37 Cal.4th 547, 582; *People v. Minifie* (1996) 13 Cal.4th 1055, 1064–1065.)

presented here; that is, a confined prisoner who receives a death threat from a cellmate. As such, appellant contends we are not bound by the prior Supreme Court language. In any event, appellant argues that our high court has also endorsed the idea that self-defense is based on necessity and imminent danger. He notes that, at times, the Supreme Court has summarized imperfect self-defense without referencing a requirement of "immediate danger." (See *People v. Simon* (2016) 1 Cal.5th 98, 132; *People v. Rangel* (2016) 62 Cal.4th 1192, 1226; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1048–1049.)

We decline appellant's invitation to ignore our high court's pronouncements. The California Supreme Court has made it abundantly clear that a threat of "future harm" is never sufficient to support self-defense, and "the fear must be of imminent harm." (*Humphrey*, *supra*, 13 Cal.4th at p. 1082.) Any perceived peril must seem " ' "immediate and present" ' " to a defendant. (*Christian S.*, *supra*, 7 Cal.4th at p. 783.) The high court has never wavered from these requirements. Both CALCRIM Nos. 505 and 571 reflect the law as articulated by the California Supreme Court, and we are bound by its decisions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Even if these disputed statements could be characterized as dicta, they are nevertheless persuasive and should be followed. (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169.)

During closing argument, appellant's trial counsel asserted that appellant had acted in perfect self-defense, and he should be found not guilty. The defense asserted that Keel "was a three-striker" who had been previously at Corcoran, a level IV prison. According to counsel, Keel had been in the "SHU" there.[23] Defense counsel reminded the jurors that Keel told appellant he had gone to the SHU because he had slashed the neck or face of another person who had refused to participate in a race riot. According to

---

[23] "SHU" stands for "security housing unit," which is a higher security facility within a prison.

19.

defense counsel, CALCRIM No. 505 permitted the jurors to consider this fact in deciding if appellant's conduct was reasonable. The defense noted that Keel was intoxicated on the morning in question, and Keel made a weapon from the drawstring of his shorts. The defense asked the jurors to ponder why appellant did not stop his assault of Keel. According to the defense, the answer was based on the prison environment. The defense asserted that, based on the prison environment, appellant had held a reasonable belief that Keel's threat was real.

We conclude that appellant's unique situation does not demonstrate flaws with CALCRIM Nos. 505 and/or 571. The jurors were permitted to consider all of the circumstances surrounding appellant's situation. It was their role to determine whether or not a necessity existed for appellant to assault Keel with force likely to produce great bodily injury. Even as a confined prisoner, appellant was not permitted to use deadly force in the absence of either a reasonable or unreasonable belief that he faced an imminent threat. He was not permitted to so act when any such threat contemplated a future harm, especially one that might never come to fruition.[24] Our Supreme Court holds that a prospective harm is never sufficient. (*Christian S.*, *supra*, 7 Cal.4th at p. 783.) Instead, the threat must represent imminent peril that requires immediate action. Such a requirement reflects the great value our society places on human life. (*Ibid.*) Thus, we discern no error in the instructions given to the jury pursuant to CALCRIM Nos. 505 and 571.

### 3. Appellant's authorities.

Appellant relies primarily on three opinions from other jurisdictions: (1) *Porter v. State* (2017) 455 Md. 220 (*Porter*); (2) *DePetris v. Kuykendall* (9th Cir. 2001) 239 F.3d 1057 (*DePetris*); and (3) *State v. Janes* (1993) 121 Wash.2d 220 (*Janes*).) He contends

---

[24] We reject appellant's assertion that his "only recourse" was to kill Keel to prevent a possible sneak attack at a later time.

20.

that these opinions are examples of how self-defense is a doctrine of necessity. These authorities do not assist him in establishing instructional error in this matter.

### a. *Porter.*

In *Porter*, an opinion from the Maryland Court of Appeals,[25] the defendant was a battered spouse who had her husband killed by a third party. (*Porter*, *supra*, 455 Md. at pp. 226–227.) The Maryland high court determined that the jury had been improperly instructed regarding imperfect self-defense. (*Id.* at p. 239.)

*Porter* holds that, under Maryland law, the elements of imperfect self-defense require a defendant "to demonstrate that she actually feared 'imminent **or** immediate' danger—not both." (*Porter*, *supra*, 455 Md. at p. 245.) The defendant in *Porter* showed she had suffered repeated mental and physical abuse from her husband. (*Id.* at pp. 227–229.) She presented "ample evidence that she lived in a constant state of fear of imminent danger" from her husband "in the weeks leading up to his death, including the morning he was killed." (*Id.* at p. 239.)

The *Porter* court noted that an "imminent threat is not dependent on its temporal proximity to the defensive act. Rather, it is one that places the defendant in imminent fear for her life." (*Porter*, *supra*, 455 Md. at p. 245.) According to *Porter*, two rationales exist for "limiting self-defense to threats of 'imminent or immediate' danger: (1) a non-imminent threat may never come to fruition; and (2) there are other ways to address a non-imminent threat besides responding with defensive force." (*Porter*, *supra*, 455 Md. at p. 247.) The high court declined to hold "that a woman suffering from battered spouse syndrome must experience abuse within minutes or hours of her defensive action to be entitled to an instruction on imperfect self-defense. Doing so would ignore the reality of intimate partner violence." (*Id.* at p. 249.)

---

**25** This is the highest appellate court in Maryland. (See <https://mdcourts.gov/courts/about> [as of June 6, 2022].)

In its opinion, the *Porter* court mentioned a hypothetical, which appellant emphasizes. A victim is kidnapped and the victim has an opportunity to kill the kidnapper and escape each morning when the kidnapper brings him food. Taken literally, the "imminent" requirement would prevent the victim from using deadly force in self-defense until the kidnapper is standing over him with a knife. (*Porter*, *supra*, 455 Md. at p. 242.) The proper inquiry should be on the " 'immediacy of the response necessary in defense.' " (*Ibid*.) If a threatened harm cannot be avoided if the intended victim waits until the last moment, then the principle of self-defense must permit him to act as early as is required to defend himself effectively. (*Ibid.*) In other words, imminence means the time for defense is now, and the defendant can no longer wait. (*Ibid.*)

Appellant argues that *Porter* provides a correct statement of law—that imperfect self-defense requires a fear of imminent **or** immediate danger. According to appellant, CALCRIM No. 571 is "materially flawed." He contends that his situation is very similar to the battered spouse in *Porter* because, like her, he felt unable to escape. He was locked up with Keel, who threatened to kill him if he fell asleep (or presumably otherwise let down his guard). Appellant asserts he cannot be expected to wait " 'until the last moment' " to act because that is when he could be seriously harmed or murdered. He argues *Porter* illustrates that a threat of imminent harm, which a reasonable person would perceive as capable of being executed without that person being able to escape, fulfills the requirement of imminence even if it is not immediate.

We conclude that *Porter* does not establish instructional error in this matter. It did not analyze California law, and cases are not authority for propositions not considered or decided. (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1134.) Moreover, out-of-state opinions are not binding on California courts. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 490; accord, *Arteaga v. Superior Court* (2015) 233 Cal.App.4th 851, 868.)

In any event, *Porter* is factually distinguishable. The defendant in *Porter* presented "extensive evidence during her trial that the violence she feared would in fact

22.

come to fruition." (*Porter*, *supra*, 455 Md. at p. 247.) In contrast, no such evidence was presented in this matter. Nothing presented to the jury established a history of violence between appellant and Keel, or even prior threats. Indeed, appellant told the jury that he was friends with Keel, and they voluntarily chose to be cellmates. They had lived together for about seven months before this murder. Appellant repeatedly testified that Keel was drunk on the morning in question, and Keel was acting out of character when this incident started. Appellant admitted at trial that he knew he was a better fighter than Keel. Appellant was confident he was going to win this fight.

Finally, appellant told the jury that a "warrior mentality" exists in prison. Appellant testified that prison is "a masculine society" and if somebody calls you out you will look "weak" if you do not respond. Appellant said he could not just wait and tell a correctional officer because he would be labeled a rat. Appellant also said he would still be in the cell with Keel, who could get the upper hand.

Appellant explained to the jury why he did not pursue other alternatives short of killing Keel. However, even *Porter* makes it clear that a non-imminent threat may never come to fruition, and there are other ways to address a non-imminent threat besides responding with deadly force. (*Porter*, *supra*, 455 Md. at p. 247.) In any event, it was the jury's role to decide appellant's credibility, and to determine whether or not appellant had other options available to him besides using deadly force. (See § 1127; see also *People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 162 [jury has exclusive province to determine witness credibility and the truth or falsity of facts].) *Porter* does not dictate reversal of appellant's conviction.

### b. *DePetris.*

In *DePetris*, the defendant shot and killed her husband while he was asleep in bed. During the trial in a California state court, she had claimed imperfect self-defense. (*DePetris*, *supra*, 239 F.3d at p. 1058.) The trial evidence had established that her

husband had subjected her to a prolonged history of physical and emotional abuse, including threatening to kill her and their young child.  (*Id.* at pp. 1059–1060.)  An expert witness testified for the defense regarding battered woman's syndrome.  (*Id.* at p. 1060.)

The state trial court precluded the defendant from introducing into evidence the husband's journal, which detailed the physical abuse he had inflicted on other people, including physical abuse of a homosexual companion, beating his stepdaughter, his rape of a friend's girlfriend, and numerous accounts of beating his first wife.  The trial court also precluded the defendant from testifying that she had read this journal both before and during the marriage, and how it had impacted her.  (*DePetris*, *supra*, 239 F.3d at pp. 1060–1061.)  The jury found her guilty of first degree murder with use of a firearm.  (*Id.* at p. 1061.)  The California Court of Appeal affirmed, holding unanimously that the journal evidence was admissible, but also holding (with one justice dissenting) that the error was not prejudicial in light of other evidence that demonstrated the defendant's credibility and the victim's propensity for violence.  (*Ibid.*)  A federal district court denied habeas relief, holding that the excluded evidence was just one piece of physical evidence that was not critical to the defense, and any presumed constitutional error was harmless in light of other evidence that was introduced in support of her defense.  (*Ibid.*)

The Ninth Circuit Court of Appeals found prejudicial error.  It concluded that the journal and the defendant's testimony about having read it were critical to her defense regarding the danger she had perceived.  (*DePetris*, *supra*, 239 F.3d at p. 1063.)  Although the jury heard testimony from other people about the husband's violence, the journal was not subject to attack on the grounds of bias or self-interest.  Instead, "it was from the victim himself."  (*Id.* at pp. 1063–1064.)  According to the Ninth Circuit, the excluded journal "would have corroborated her testimony about why she believed that harm was imminent and that shooting him provided the only avenue of escape.  Although the unreasonableness of that belief disqualifies the petitioner from ordinary self-defense,

24.

the actuality of that belief, if true, entitles her to imperfect self-defense." (*Id.* at p. 1064, italics omitted.)

In this matter, appellant acknowledges that he is not an abused woman. However, he contends that the "underlying legal principle" found in *DePetris* should apply here. According to appellant, if a person is attacked by an assailant who manifests an intent to kill, and the person honestly and actually believes in the necessity of killing the assailant because there is no way to escape the imminent threat of great bodily injury, then the person does not harbor the malice required for murder.

We decline to rely on *DePetris*. Lower federal decisions, including those of the Ninth Circuit Court of Appeals, are not binding on us. (*People v. Avena* (1996) 13 Cal.4th 394, 431; *McLaughlin v. Walnut Properties, Inc.* (2004) 119 Cal.App.4th 293, 297.) In any event, *DePetris* did not analyze alleged instructional error regarding imperfect self-defense. Instead, it focused on whether prejudice resulted from the erroneous exclusion of evidence that tended to support the defendant's claim that she faced imminent fear. *DePetris* does not establish or even reasonably suggest that instructional error occurred in this matter.

### c.    *Janes.*

In *Janes*, the defendant killed a man who had sporadically abused him for 10 years. (*Janes*, *supra*, 121 Wash.2d at p. 222.) Expert testimony demonstrated that the defendant had suffered from battered child syndrome. (*Id.* at p. 237.) The trial court did not give a self-defense instruction. The jury found the defendant not guilty of first degree murder but guilty of second degree murder, and guilty of two counts of second degree assault. (*Id.* at p. 231.)

The Supreme Court of Washington concluded that the trial court had failed to properly consider whether or not to instruct on self-defense. (*Janes*, *supra*, 121 Wash.2d at p. 242.) The matter was remanded for the trial court to reconsider its ruling denying

25.

the self-defense instruction. (*Ibid.*) In reaching its ruling, the *Janes* court felt it was important to distinguish " 'imminent harm' from 'immediate harm' " and it concluded that "[t]hese two words have divergent meanings." (*Id.* at p. 241.) The applicable statute in Washington "only requires that the harm faced by the defendant be imminent." (*Ibid.*) The *Janes* court stated that the reasonableness of a defendant's perception of imminent harm is not necessarily negated if the "triggering behavior and the abusive episode are divided by time." (*Ibid.*) "Even an otherwise innocuous comment which occurred days before the homicide could be highly relevant when the evidence shows that such a comment inevitably signaled the beginning of an abusive episode." (*Id.* at pp. 241–242.)

According to appellant, *Janes* illustrates that a threat of imminent harm, which a reasonable person would perceive as capable of being executed without that person being able to escape, fulfills the requirement of "imminence" even if it is not "immediate." We conclude that *Janes* does not assist appellant. That opinion did not analyze California law, and cases are not authority for propositions not considered or decided. (*Loeffler v. Target Corp.*, *supra*, 58 Cal.4th at p. 1134.) As an out-of-state opinion, it is not binding on us. (*Episcopal Church Cases, supra*, 45 Cal.4th at p. 490; accord, *Arteaga v. Superior Court*, *supra*, 233 Cal.App.4th at p. 868.) In any event, *Janes* is distinguishable. Unlike what occurred in *Janes*, appellant's jury received correct statements of law regarding both perfect and imperfect self-defense. It was for the jury to determine whether or not appellant was justified in using deadly force when he assaulted Keel. *Janes* does not require reversal of the instant matter.

### 4. *Our conclusion.*

We note that, in the context of a battered spouse, "Evidence Code section 1107 permits admission of expert testimony regarding intimate partner battering, but it does not modify the imminence requirement." (*People v. Battle* (2011) 198 Cal.App.4th 50, 72.) In California, battered women's syndrome evidence may be used to establish either

26.

perfect or imperfect self-defense. (*People v. Erickson* (1997) 57 Cal.App.4th 1391, 1399; see also *Humphrey*, *supra*, 13 Cal.4th at p. 1086 [expert testimony on effects of spousal battery is relevant to support imperfect self-defense]; *In re Walker* (2007) 147 Cal.App.4th 533, 546 [same].) CALCRIM No. 851 instructs on intimate partner battering and its effects, including whether a defendant "actually believed" she needed to defend herself "against an immediate threat of great bodily injury or death, and whether that belief was reasonable or unreasonable."

Here, the defense did not call an expert witness to opine on appellant's situation as an incarcerated prisoner. In any event, nothing shows a history of violence or even prior threats between appellant and Keel. Appellant told the jury that Keel had been "a good cellie." Appellant repeatedly testified that Keel was acting out of character when this incident started. Appellant's situation was not at all analogous with a battered woman.

Based on our independent review, the instructions provided to the jury pursuant to CALCRIM Nos. 505 and 571 accurately stated the law. A threat of future harm is insufficient to establish either perfect or imperfect self-defense. (*Humphrey*, *supra*, 13 Cal.4th at p. 1082; *Christian S.*, *supra*, 7 Cal.4th at p. 783.) Instead, the fear must be from imminent harm. (*Humphrey*, *supra*, at p. 1082.) Any perceived peril must seem " ' "immediate and present" ' " to a defendant. (*Christian S.*, *supra*, 7 Cal.4th at p. 783.) " 'This definition of imminence reflects the great value our society places on human life.' " (*Ibid*.)

It was up to the jury to determine whether or not appellant (either reasonably or unreasonably) felt threatened from an imminent harm. We disagree that these instructions caused the jury to misapply the law. Appellant's claims are without merit and reversal is not warranted.[26]

---

[26] Because instructional error did not occur, we do not address appellant's claims regarding alleged prejudice.

## II.     Substantial Evidence Supported an Instruction on Mutual Combat.

Appellant argues that the trial court prejudicially erred in instructing the jury with CALCRIM No. 3471 regarding the doctrine of mutual combat. He contends that substantial evidence did not support this instruction.

### A.     *Background.*

Based on CALCRIM No. 3471, the trial court instructed the jurors in relevant part that appellant did not have a right to self-defense if he and Keel had engaged in mutual combat (or if appellant started the fight). If mutual combat occurred, appellant had a right to self-defense only if he (1) tried to stop fighting; and (2) communicated to Keel (through words or conduct) that he wanted to stop fighting; and (3) gave Keel a chance to stop fighting. If these requirements were met, appellant then had a right to self-defense if Keel continued to fight. The jurors were told that "[a] fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." The jurors were also informed that, when an attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends.

### B.     *Standard of review.*

A trial court is obligated to instruct a jury on the general principles of law that are raised by the evidence. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) Substantial evidence must exist for a trial court to provide a particular jury instruction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) In this context, substantial evidence would "allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof." (*Ibid.*) In other words, evidence must exist which is sufficient to deserve consideration by the jury. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049–1050 (*Ross*); *People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.) It is error for a trial court to give an instruction which, while correctly stating the law, has no application to the facts of the case. (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

28.

### C.    Analysis.

Appellant argues that it was error for the trial court to instruct the jury on the concept of mutual combat.  He relies on *Ross*, *supra*, 155 Cal.App.4th 1033.  He maintains that this erroneous instruction barred him from relying on either perfect or imperfect self-defense.

We reject appellant's arguments and conclude that substantial evidence supported the trial court's decision to instruct the jury regarding the doctrine of mutual combat.  We first address the parties' dispute regarding forfeiture.

### 1.    *We decline to find forfeiture.*

During the instructional conference below, the trial court stated its belief that a mutual combat instruction was appropriate.  Appellant's counsel objected when the trial court announced its intention to instruct the jury with CALCRIM No. 3471 regarding mutual combat.  However, defense counsel did not give a specific reason for objecting and the court did not rule on any specific objection, but it asked the parties for discussion regarding how the instruction should be worded. The court subsequently stated it was up to the jury to decide the issue, and the court determined it would provide the instruction.

Respondent contends that appellant has not preserved this claim for review.  According to respondent, appellant did not make a specific objection regarding why CALCRIM No. 3471 should be excluded.  Respondent takes the position that this instruction was a correct statement of law and we should find forfeiture.

In contrast, appellant relies on section 1259, and he also contends that the trial court erred as a matter of law.  Finally, appellant raises a claim of ineffective assistance of counsel.

We decline to find forfeiture.  Although appellant's trial counsel was not specific, an objection was lodged against an instruction on mutual combat.  In any event, appellant argues that this disputed instruction should never have been given to the jury, and it improperly eliminated his ability to raise self-defense.  As a result, appellant maintains

29.

that the prosecution's burden of proof was reduced. If appellant is correct, this alleged error would impact his substantial rights. As such, this claim is cognizable. (See *People v. Kelly*, *supra*, 42 Cal.4th at p. 791 [declining to find forfeiture based on claim the disputed instruction "was not correct in law and omitted an element of the offense"].) Thus, we will analyze this claim.[27] However, we reject it on its merits.

### 2. *Substantial evidence supported the trial court's decision.*

The legal term "mutual combat" does not refer merely to a reciprocal exchange of blows. (*People v. Nguyen*, *supra*, 61 Cal.4th 1015, 1044.) Instead, it is a mutual intent or agreement to engage in hostilities. It is more than the combat itself. (*Ibid.*) In other words, "mutual combat" is something that is "prearranged." (*People v. Jackson* (2014) 58 Cal.4th 724, 760.) Unless a defendant takes specific steps to desist, a defendant's participation in mutual combat may preclude a claim of self-defense against a charge of assault, or similar offense. (*Id.* at pp. 760–761.)

In appellant's cited opinion, *Ross*, the appellate court noted the inherent conflict between a layman's understanding of "mutual combat" and its legal definition. Under a lay definition, any violent struggle between two or more people, however it came into being, could be called "mutual combat." (*Ross*, *supra*, 155 Cal.App.4th at p. 1044.) However, going back to the 1800's, the legal term "mutual combat" was used to designate self-defense in homicides committed during duels or other fights begun or continued by mutual consent or agreement, whether express or implied. (*Id.* at p. 1045.) Evidence must exist from which a jury could reasonably find that both combatants actually consented or intended to fight before the claimed need for self-defense arose. (*Id.* at pp. 1046–1047.)

---

[27] It is unnecessary to consider appellant's claim of ineffective assistance of counsel. (*People v. Smithey*, *supra*, 20 Cal.4th at pp. 976–977, fn. 7.)

In *Ross*, the male defendant engaged in a verbal exchange with a female victim. She slapped the defendant, who responded with a blow that fractured her cheekbone. (*Ross*, *supra*, 155 Cal.App.4th at p. 1036.) Over a defense objection, the trial court instructed the jury that the defendant could not rely on self-defense if he was engaged in mutual combat with the victim. (*Ibid.*) During deliberations, the jury asked for the legal definition of "mutual combat," and the court told the jurors to rely on the ordinary meaning of those words. (*Ibid.*) The appellate court concluded that the jury was erroneously permitted to believe "that any exchange of blows disqualifies both participants from claiming a right of self-defense." (*Ibid.*) However, this "doctrine applies only to a violent confrontation conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight." (*Ibid*.) The *Ross* court found insufficient evidence to establish any such arrangement or agreement, and there was a substantial basis for the jury to find that the defendant may have acted in self-defense. Thus, the judgment was reversed. (*Ibid.*)

Following *Ross*, CALCRIM No. 3471 was amended in 2008 to define "mutual combat." The revision now appearing in this instruction states that "[a] fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (CALCRIM No. 3471.) This amended language following *Ross* was provided to appellant's jury as part of the court's instruction under CALCRIM No. 3471.

Appellant contends that the 2008 revision to CALCRIM No. 3471 did not correctly implement *Ross* or solve the problem that *Ross* addressed. According to appellant, *Ross* properly held that the doctrine of mutual combat "originated with parties who agreed to a prearranged duel." Appellant argues that the amended language in CALCRIM No. 3471 that defines "mutual combat" is still susceptible to an erroneous understanding from jurors that, if A strikes B and B strikes A back in response, then neither party is entitled to claim self-defense.

31.

Appellant also asserts that, similar to *Ross,* no evidence from his trial showed a mutual intent to engage in combat. He maintains that Keel repeatedly started new assaults of him and threatened to kill him, but he (appellant) merely responded with greater force each time to meet the new threat. Appellant argues that he continuously tried to calm down the situation and he tried to get Keel to desist.

Appellant concedes that *Ross* is factually distinguishable from his situation. Nevertheless, he asserts that, similar to *Ross*, there is a lack of evidence that either he or Keel had an exchange of blows pursuant to a mutual intention, consent or agreement preceding the initiation of hostilities. Appellant also contends that the instructions given to his jury failed to convey the essential requirement that both combatants had to actually consent or intend to fight before the claimed need for self-defense arose. He argues a "high likelihood" exists that the jury construed the mutual combat instruction in everyday English.

We find appellant's various arguments unpersuasive. The trial court stated that the situation "impliedly" demonstrated a mutual agreement to engage in some level of mutual combat. The court felt that evidence warranted the instruction. Although the court did not explain why it believed a mutual combat instruction was appropriate, substantial evidence supports the court's decision.

Appellant testified that he turned down his radio and Keel complained because he was listening to a song. They had an exchange of words and Keel told appellant, "[B]oy, you think you're a tough guy, don't you?"

According to appellant, Keel was drunk and acting out of character. Keel gave him dirty looks and said he would "bounce" appellant "off everything in this cell." Appellant testified that this was "a normal prison threat." Appellant told the jury that they had eye contact and a lot of tension. Appellant claimed that he told Keel to calm down and stop drinking.

According to appellant, Keel got into a fighting stance. Appellant asked Keel if he was "serious" and if he really wanted "to do this." Keel said, "[Y]eah, come on." Appellant told him, "[Y]ou know, you're going to lose, right?" Keel said, "[C]ome on, motherfucker, come on." Appellant moved towards him and Keel threw the first punch. They exchanged punches and appellant knocked Keel to the ground.

Appellant told the jury that a person cannot back down in prison or show "any weakness." He testified that, when "somebody calls you out" in prison "you have to accept the challenge." He said prison is "a masculine society" and a "warrior mentality" exists. If somebody calls you out, you will look weak if you do not do anything.

Appellant's own testimony overwhelmingly demonstrated that an instruction of mutual combat was appropriate. Although Keel made verbal threats, he did not move towards appellant or otherwise touch him until appellant moved towards him. Indeed, after Keel took a fighting stance, appellant asked Keel if he was certain that he wanted to fight, noting that Keel was going to lose. After Keel encouraged appellant to come at him, appellant moved towards him and Keel threw the first punch. From this, the jury could reasonably find that appellant and Keel mutually agreed to fight before appellant's claim of self-defense arose. (See *Ross*, *supra*, 155 Cal.App.4th at pp. 1046–1047.) The reasonable inferences drawn from appellant's testimony amply established appellant's express or implied agreement to engage in a mutual exchange of blows. Thus, substantial evidence supports the trial court's decision to instruct the jury on the doctrine of mutual combat.

Appellant contends that, when Keel got into his initial fighting stance, he (appellant) was trying to calm down the situation. Appellant asserts that his statement, "[Y]ou know, you're going to lose" was not an agreement to fight but, rather, an attempt to warn Keel to stop. Appellant also argues it is improper to focus on his initial verbal exchange with Keel because that is not when the need for perfect or imperfect self-defense accrued. According to appellant, his need for self-defense arose "after the initial

fracas had ceased." It was after the initial exchange of blows when Keel said that appellant had to sleep sometime and "I will cut your throat and fuck you." While saying this, Keel was trying to fashion a crude weapon (the drawstring from his shorts). Appellant maintains that no evidence established the doctrine of mutual combat when Keel made his threat, which triggered his claim of self-defense. Appellant also notes that Keel was the only one uttering threats, swearing, demanding a fight and assuming a fighting stance.

Appellant's various assertions regarding how to view the evidence do not alter our conclusion that the trial court did not err. Although appellant can point to other interpretations that may be drawn from the record, substantial evidence supports the trial court's decision to instruct on the doctrine of mutual combat. Appellant's comments to Keel, and appellant's decision to walk towards him, overwhelmingly suggest a mutual agreement to fight before the first blows were exchanged. Thus, it was a factual issue for the jury to determine whether mutual combat existed and, if so, whether or not (1) appellant actually and in good faith tried to stop fighting; (2) he indicated by word or conduct to Keel (in a way a reasonable person would understand) that he wanted to stop fighting and he had stopped fighting; and (3) he gave Keel a chance to stop fighting. (CALCRIM No. 3471.) Thus, this issue was properly presented to the jury for it to resolve disputed issues of fact.

Finally, we reject appellant's assertion that the 2008 amendment to CALCRIM No. 3471 is erroneous. According to *Ross*, "mutual combat" is "fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight." (*Ross*, *supra*, 155 Cal.App.4th at pp. 1046–1047.) *Ross* cautioned that "there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*Id.* at p. 1047.) The amended language in CALCRIM No. 3471 informs a jury that "[a] fight is mutual combat when it began or continued by mutual consent or

34.

agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (CALCRIM No. 3471, italics omitted.) Contrary to appellant's assertion, this amended language does not reasonably suggest that, if a person unexpectedly punches a victim, who fights back, the legal definition of "mutual combat" is met. We perceive no reasonable likelihood that a jury would interpret this language in the manner appellant now claims. (See *People v. Cross*, *supra*, 45 Cal.4th at pp. 67–68 [defendant must demonstrate a reasonable likelihood a jury instruction was understood as he interprets it].) Consequently, the amendment to CALCRIM No. 3471 is not defective, and instructional error is not present.

Based on this record, the trial court did not err in its decision to instruct the jury with CALCRIM No. 3471 regarding the doctrine of mutual combat. Substantial evidence supported such an instruction. Accordingly, appellant's arguments are without merit and reversal is not warranted.[28]

## III. Instructional Error Did Not Occur with CALCRIM No. 570 and any Presumed Error is Harmless.

Voluntary manslaughter is codified in California as the unlawful killing of a human being without malice from either "a sudden quarrel or heat of passion." (§ 192, subd. (a).) First enacted in 1872, section 192 does not define either "sudden quarrel" or "heat of passion."

In two separate but overlapping claims, appellant contends that CALCRIM No. 570, which defines voluntary manslaughter, is legally flawed in two ways. First, he asserts an "intense emotion" should not be required to establish "heat of passion." Second, he argues that "sudden quarrel" and "heat of passion" must have different elements, but CALCRIM No. 570 treats them identically.

---

[28] Because substantial evidence supported the trial court's decision to instruct on the doctrine of mutual combat, we do not address appellant's arguments regarding alleged prejudice.

We use a de novo review to analyze this claim of instructional error. (*People v. Mitchell*, *supra*, 7 Cal.5th at p. 579.) We reject appellant's arguments and conclude that CALCRIM No. 570 correctly states the law regarding voluntary manslaughter. We also find any presumed error harmless. We first address forfeiture.

### A.  *We decline to find forfeiture.*

At trial, appellant requested an instruction on heat of passion. As a result, respondent contends that appellant cannot advance these claims on appeal because he did not raise his legal arguments below or otherwise object to the language contained in CALCRIM No. 570.

We decline to find forfeiture. Appellant argues that CALCRIM No. 570 is erroneous as a matter of law in multiple ways. Thus, appellant's claims did not require objections to preserve them for appellate review. (See *People v. Kelly*, *supra*, 42 Cal.4th at p. 791; *People v. Smithey*, *supra*, 20 Cal.4th at pp. 976–977, fn. 7.) Likewise, the doctrine of invited error is inapplicable here. (See *People v. Moore*, *supra*, 51 Cal.4th at p. 410.) Consequently, we will review the merits of appellant's assertions. However, we determine that instructional error did not occur.[29]

### B.  *The requirements of CALCRIM No. 570.*

CALCRIM No. 570 states that for both "sudden quarrel" and "heat of passion" jurors must determine (1) whether the defendant was provoked; (2) whether as a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and (3) whether the provocation would have caused a person of average disposition to act rashly and without due deliberation; in other words, "from passion rather than from judgment." (CALCRIM No. 570.)

---

[29]  Because we will review the merits of appellant's arguments, it is unnecessary to consider appellant's claim of ineffective assistance of counsel. (See *People v. Smithey*, *supra*, 20 Cal.4th at pp. 976–977, fn. 7.)

The term "sudden quarrel" is not defined in CALCRIM No. 570.[30]  In contrast, it does discuss "heat of passion."  It states that "[h]eat of passion does not require anger, rage, or any specific emotion.  It can be any violent or intense emotion that causes a person to act without due deliberation and reflection."  The instruction also states that "[i]n order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as [the trial court has] defined it.  While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time."  (CALCRIM No. 570.)  Appellant's jury was instructed on these concepts.

### C.  CALCRIM No. 570 correctly instructs regarding "heat of passion."

In appellant's first argument, he asserts it is legally improper to require a defendant to experience or manifest an "intense emotion" for voluntary manslaughter to exist.  He contends that the real issue is whether a defendant's reason was obscured in a manner that would cause ordinary people to act rashly or without due deliberation.  He argues that even a stoic person can have his reason obscured without that person exhibiting intense emotion.  Appellant concedes that the word "passion" can refer to intense or violent emotions, but he argues that such a definition is not exclusive.  He cites Google Books, which shows a dictionary entry from 1828 that states the word "passion" has historically also meant "[a]ny effect caused by external agency; susceptibility of effect from external action."  (Johnson & Walker, A Dictionary of the English Language (1828) p. 526.)  He notes that a modern dictionary definition of "passion" encompasses a

---

[30]  According to the online version of Merriam-Webster, "quarrel" as a noun means in relevant part:  (1) "a ground of dispute or complaint" or (2) "a usually verbal conflict between antagonists."  As a verb, this word means:  (1) "to find fault" or (2) "to contend or dispute actively."  (<https://www.merriam-webster.com/dictionary/quarrel> [as of June 6, 2022].)

similar alternative definition of "the state or capacity of being acted on by external agents or forces." (<https://merriam-webster.com/dictionary/passion> [as of June 6, 2022].) Appellant argues that these dictionary definitions, and not a focus on emotion, should be the legal foundation for establishing voluntary manslaughter based on "heat of passion."

We reject appellant's arguments. In 1856, the California Supreme Court wrote that, in order to reduce murder to manslaughter, it is "necessary to establish some provocation apparently sufficient to render the passion irresistible." (*People v. Freeland* (1856) 6 Cal. 96, 98.) About 60 years later, our high court wrote that the fundamental inquiry for heat of passion is whether or not a defendant's reason "was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." (*People v. Logan* (1917) 175 Cal. 45, 49.)

In 1958, the high court held that " 'passion' " does not necessarily mean " 'rage' or 'anger.' " (*People v. Borchers* (1958) 50 Cal.2d 321, 329.) The Supreme Court noted in the same opinion that, according to a dictionary definition, " 'passion' may be any 'Violent, intense, high-wrought, or enthusiastic emotion.' [Citation.]" (*Ibid.*)

In 2013, our Supreme Court wrote that, to be adequate, any "provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*People v. Beltran* (2013) 56 Cal.4th 935, 949 (*Beltran*).) Any "anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a

certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured."[31] (*Ibid.*)

At least one appellate court has already concluded that CALCRIM No. 570 accurately states the law. (See *People v. Jones* (2014) 223 Cal.App.4th 995, 1001.) We see no reason to dispute that holding. CALCRIM No. 570's language regarding an "intense emotion" is based on prior pronouncements from our Supreme Court, and we are bound by those prior decisions. (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455.) Even if the high court's statements could be characterized as dicta, statements of the Supreme Court are generally considered persuasive and lower courts should generally follow its dicta. (*Hubbard v. Superior Court*, *supra*, 66 Cal.App.4th at p. 1169; *People v. Trice* (1977) 75 Cal.App.3d 984, 987.) Accordingly, the trial court did not err in instructing the jury with CALCRIM No. 570.

Appellant relies on two opinions: (1) *People v. Elmore* (1914) 167 Cal. 205 (*Elmore*) and (2) *State v. Johnson* (Minn. 2006) 719 N.W.2d 619 (*Johnson*). These authorities do not alter our conclusion that instructional error did not occur.

### 1. *Elmore*.

In *Elmore*, the defendant was in a saloon when the decedent began to harass an older patron, and the defendant intervened. (*Elmore*, *supra*, 167 Cal. at pp. 207–208.) After a verbal exchange, the decedent slapped the defendant's head and challenged him to a fight. The defendant said he did not want to fight and he asked the decedent to leave him alone, noting that the decedent was a much younger man. (*Id.* at p. 208.) A short

---

[31] Appellant cites *Beltran* for the "correct legal standard." According to appellant, *Beltran* establishes that a defendant must act "not out of rational thought but out of unconsidered reaction to the provocation." (*Beltran*, *supra*, 56 Cal.4th at p. 942.) Appellant argues that *Beltran* does not require a defendant to have experienced intense emotion, and any instruction that incorporates such a requirement is erroneous. We are not convinced. In that same opinion, the *Beltran* court stated, "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*Id.* at p. 949.)

39.

time later, the decedent rushed at the defendant and struck him several times. The defendant fatally cut the decedent's neck with a knife. (*Ibid.*) A jury found the defendant guilty of second degree murder. (*Id.* at p. 207.)

According to the Supreme Court, the evidence showed either self-defense or a heat of passion from the decedent's "unprovoked attack and violent blows." (*Elmore*, *supra*, 167 Cal. at p. 211.) The court believed that "[t]he blows given would naturally arouse a sudden passion." (*Ibid.*) The circumstances tended to show that the defendant "was acting in good faith and really desired to avoid any quarrel or difficulty." (*Ibid.*) The high court reversed the defendant's judgment. (*Id.* at p. 212.)

Appellant contends that *Elmore* is "similar" to his case. He argues that, like the defendant in *Elmore*, he repeatedly warned Keel not to come at him. He also contends that, like the defendant in *Elmore*, he did not want to fight.

We disagree that *Elmore* is similar to the present matter or that it assists appellant. The high court in *Elmore* did not address alleged instructional error. Instead, it focused on whether sufficient evidence supported the verdict. It determined that a reasonable jury could not have found the defendant guilty of second degree murder based on the facts presented. (*Elmore*, *supra*, 167 Cal. at pp. 211–212.) In contrast to *Elmore*, appellant does not assert that his judgment is improper due to insufficient evidence. Moreover, appellant's jury was properly instructed on the law. Based on the verdict rendered, it is apparent that the jury rejected any argument that appellant's crime should be reduced to voluntary manslaughter. *Elmore* is inapposite to the present situation and it does not require reversal of appellant's judgment.

### 2. *Johnson.*

In *Johnson*, an opinion from the Supreme Court of Minnesota, a jury found the defendant guilty of second degree murder for the shooting death of his girlfriend. (*Johnson*, *supra*, 719 N.W.2d at p. 622.) The girlfriend died instantly from a single

gunshot to the top of her head.  The pistol used to kill her was found in her hand.  (*Ibid.*)  The state's theory was that the defendant killed her and then shot himself to make it look like he did not intentionally kill her.  The defendant testified that she shot him first, and he could not remember what happened after she shot him.  He did not deny that he shot her.  The trial court refused to instruct the jury on either heat of passion or self-defense. (*Ibid.*)  The Minnesota Supreme Court concluded that the trial court had prejudicially erred and a new trial was necessary.  (*Id.* at p. 632.)

Although the record strongly supported an argument that the defendant was not angry and he had remained calm before and after the shooting, it was the defendant's emotional state at the time of the killing that was the primary issue.  (*Johnson*, *supra*, 719 N.W.2d at pp. 626–627.)  At trial, the defendant was generally described as having a very calm and mellow character.  (*Id.* at p. 624.)  There was "very little direct evidence" of the defendant's emotional state when the killing occurred.  (*Id.* at p. 627.)  However, some evidence supported the defendant's claim that he had acted in the heat of passion, particularly when viewed in the light most favorable to the defense.  (*Ibid.*)  He was shot after arguing with his girlfriend, and she had been hitting and kicking him.  An eyewitness testified that, after the first shot, the defendant had a look of " 'disbelief' or 'shock' on his face."  (*Ibid.*)  The high court concluded that such a look is consistent with someone whose reason was clouded or willpower weakened, but it could also be consistent with a very calm demeanor.  Viewing the evidence in the light most favorable to the defense, a rational jury could have made a reasonable inference that the defendant's reasoning was clouded and his willpower weakened at the time of the shooting.  (*Ibid.*)  Moreover, a jury could also determine that the defendant "engaged in an increasingly heated argument" with his girlfriend "that escalated to a physical altercation" when she shot him, which provoked him to shoot her back "just seconds later."  (*Id.* at p. 628.)  Thus, evidence supported the defendant's claim that he had acted in a heat of passion.  (*Ibid.*)

41.

Appellant argues that *Johnson* stands for the proposition that a characteristically calm person can remain calm even during a stressful event and still rely on the doctrine of heat of passion. Appellant contends that ample evidence supports his position that Keel sufficiently provoked him so that he (appellant) simply reacted without rational thought. Appellant reiterates that Keel was drunk, angry, and he made a death threat. Appellant maintains that such a threat had meaning in the prison context. Keel had a "track record of slitting someone's throat." Appellant insists that this evidence amounted to legally sufficient provocation. Finally, appellant acknowledges he is not emotional by nature, and he appeared "calm" and "cold" after killing Keel. However, he argues he was upset about killing his friend, but he could not show emotion in prison.

Appellant's arguments are without merit and *Johnson* does not require reversal of his judgment. First, *Johnson* did not analyze California law, and cases are not authority for propositions not considered or decided. (*Loeffler v. Target Corp.*, *supra*, 58 Cal.4th at p. 1134.) Moreover, as an out-of-state opinion, *Johnson* has no binding authority in California. (See *Episcopal Church Cases*, *supra*, 45 Cal.4th at p. 490; accord, *Arteaga v. Superior Court*, *supra*, 233 Cal.App.4th at p. 868.) In any event, *Johnson* is distinguishable. Unlike what occurred in *Johnson*, appellant's jury received a legally correct instruction regarding heat of passion. Appellant explained at trial why and how he delivered the fatal kicks to Keel's head. It was the jury's role to determine (1) whether or not appellant was provoked; (2) whether or not as a result of the provocation he acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and (3) whether or not the provocation would have caused a person of average disposition to act rashly and without due deliberation; in other words, "from passion rather than from judgment." (CALCRIM No. 570.) *Johnson* does not establish instructional error in this matter.

Based on this record, the trial court properly instructed the jury with CALCRIM No. 570 regarding heat of passion. This instruction correctly conveyed the law.

Therefore, reversal is not warranted and this claim is without merit. In any event, we also conclude later in this opinion that any presumed instructional error is harmless.

### D. CALCRIM No. 570 correctly instructs regarding "sudden quarrel."

In appellant's second claim, he argues that CALCRIM No. 570 is legally flawed because it does not differentiate between "sudden quarrel" and "heat of passion." Because these terms appear in section 192, subdivision (a), with the disjunctive "or" between them, appellant contends that these concepts must have different legal meanings. According to appellant, if they have no distinct legal definition, portions of section 192, subdivision (a), would be rendered meaningless or redundant, which violates principles of statutory construction.[32] He asserts it is inappropriate to look at common law definitions because criminal laws in California are based solely on statutes.[33]

Appellant's arguments are unpersuasive. Contrary to his assertion, it is proper for us to examine the common law when analyzing the meaning of "sudden quarrel" and "heat of passion." Our Supreme Court makes it clear that many provisions of the Penal Code were enacted using common law terms, and those terms "must be interpreted in light of the common law." (*People v. Chun*, *supra*, 45 Cal.4th at p. 1183.) In fact, a presumption exists that the Legislature intended for a statute couched in common law language to continue those common law rules in statutory form. (*Id.* at p. 1184.) Thus, "we are free to look to the common law to supply the requisite certainty to an existing statute." (*People v. Heitzman* (1994) 9 Cal.4th 189, 212, fn. 19.)

Neither party cites any authority explaining the legal concept of "sudden quarrel" or how that interacts with or perhaps differs from "heat of passion." We have failed to

---

[32] The California Supreme Court has stated that a court should avoid interpreting a statute in a way that renders its language meaningless. (*Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 386.)

[33] In general, California does not recognize nonstatutory crimes. (*People v. Chun* (2009) 45 Cal.4th 1172, 1183; see § 6.)

43.

discover any California authorities which discuss this issue. However, some federal opinions are instructive.

Mirroring the law in California, federal law defines voluntary manslaughter as an unlawful killing of a human being without malice occurring "[u]pon a sudden quarrel or heat of passion." (18 U.S.C. § 1112(a).) Federal courts have concluded that, based on the historical development from the common law, there is no legal difference between "sudden quarrel" and "heat of passion." (See *United States v. Martinez* (7th Cir. 1993) 988 F.2d 685, 694; *United States v. McRae* (5th Cir. 1979) 593 F.2d 700, 705.) Instead, the common law concept of "sudden quarrel" evolved over hundreds of years to merge with the common law doctrine of "heat of passion." (See *United States v. Martinez*, *supra*, 988 F.2d at pp. 691–692 [detailing in depth the historical underpinnings of "sudden quarrel" and "heat of passion"].) As one federal court has noted, a mere quarrel occurring without passion would be insufficient to reduce murder to voluntary manslaughter. (*United States v. McRae*, *supra*, 593 F.2d at p. 705.)

The California Supreme Court makes it clear that a person who intentionally kills as a result of provocation—either a sudden quarrel or heat of passion—lacks malice and is guilty not of murder but of the lesser offense of voluntary manslaughter. (*People v. Lasko* (2000) 23 Cal.4th 101, 108.) The key issue in California is whether provocation would have caused a person of average disposition to act rashly and without due deliberation. (See CALCRIM No. 570.) More than "mere words" are needed. (*Beltran*, *supra*, 56 Cal.4th at p. 948.) No matter how grievous they are, words or gestures are generally not sufficient to reduce murder to manslaughter. (*People v. Dixon* (1961) 192 Cal.App.2d 88, 91; see also *People v. Lucas* (1997) 55 Cal.App.4th 721, 739 [smirks, dirty looks or yelling provocative names did not reasonably establish provocation to shoot].)

Based on the foregoing, we reject appellant's assertion that "sudden quarrel" and "heat of passion" require different legal elements. These terms merged at common law,

44.

and nothing rebuts a presumption that our Legislature intended for section 192, subdivision (a), to continue those common law definitions.  CALCRIM No. 570 properly conveys the law that voluntary manslaughter—whether based on a sudden quarrel or heat of passion—requires adequate provocation.  Consequently, there is no reasonable likelihood the jury applied this instruction in an impermissible manner.  Therefore, instructional error did not occur.  In any event, we find any presumed error harmless.

### E.      *Any presumed error is harmless.*

The parties dispute the appropriate standard of review to analyze prejudice.  Appellant relies on *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).  Under *Chapman*, the beneficiary of a federal constitutional error must prove beyond a reasonable doubt that the error did not contribute to the verdict.  (*Id.* at p. 24.)  In the alternative, appellant maintains that prejudice occurred even if the state standard is used under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).  Under *Watson*, the question is whether it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*Id.* at p. 836.)  Respondent urges us to use *Watson*.

We need not resolve the appropriate standard of review in this situation.  Instead, any presumed instructional error was harmless under both standards.  Appellant told the jury that, just before he delivered the final blows to Keel's head, appellant decided he was "going to make sure [Keel was] hurt, that he's leaving and this situation is over."  Appellant then repeatedly kicked Keel's head, causing extensive fractures to his skull.  While those fatal blows were delivered, Keel was lying face down and he was nonresponsive.  Appellant then took a cord and placed it around Keel's neck.  Appellant pulled up so that Keel's head and chest were lifted off the ground.  Keel was limp when appellant pulled him up with the cord.  At trial, appellant agreed that he left the ligature

45.

marks on Keel's neck. He agreed that, around that time, he could "kind of tell" that Keel was dead.

Appellant testified that, after the fight ended, he knew he was going to be segregated in "the hole." During the approximate 20-minute period before a correctional officer responded, appellant sent some of his personal property, such as his wristwatch and CD's, over to Fortini. Appellant took off his work boots and he put on sneakers. Appellant told the jury that he realized his actions sounded "cold" because Keel was lying unresponsive on the floor and dying (or already dead) but "that's how our minds operate in prison." He said it was normal for a prisoner headed to the hole to want to protect his personal property.

Multiple officers heard appellant say words to the effect that Keel was dead and it was pointless to render medical aid to him. At trial, appellant agreed with the officers' general testimony that he had appeared calm or cold after this homicide. He told the jury that he does not get very emotional and he lives in a violent world. According to appellant, a person cannot show emotion in prison. However, appellant claimed to the jury that he was upset about what had happened because Keel had been his friend. Appellant told the jury that, because inmates do not talk to law enforcement, he did not share with the officers that day what had happened in the cell with Keel.

Appellant's own testimony overwhelmingly established that his reasoning or judgment was not obscured when he killed Keel. (See CALCRIM No. 570.) To the contrary, it is readily apparent that appellant calculated how and when he would end this fight. Further, almost immediately after pulling on Keel's neck with the cord, appellant organized his property in anticipation of going into solitary confinement. He appeared very calm and cold when speaking with law enforcement just after this fatal incident. All

of this is additional circumstantial evidence overwhelmingly showing that appellant exercised reason and due deliberation when he decided to fatally stomp on Keel's head.[34]

Based on this record, we can declare beyond any reasonable doubt that the alleged instructional errors in CALCRIM No. 570 did not contribute to the verdict. (See *Chapman*, *supra*, 386 U.S. at p. 24.) In addition, it is not reasonably probable a result more favorable to appellant would have been reached in the absence of the alleged errors. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) Accordingly, any presumed instructional error is harmless. Therefore, appellant's claims are without merit and reversal is not appropriate.

## IV. Cumulative Error Did Not Occur.

Appellant raises a claim of cumulative error. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) A claim of cumulative error is essentially a due process claim. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) The test is whether the defendant received a fair trial. (*Ibid.*)

Appellant's claim of cumulative error is without merit because we have rejected all individual claims. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].) Taking all of appellant's arguments and claims into account, we are satisfied that he received a fair adjudication.

---

[34] During closing arguments, the prosecutor asserted that appellant had shown no emotion and voluntary manslaughter was inapplicable because appellant had not acted under an "intense emotion" when he killed Keel. In light of appellant's testimony regarding how and why he killed Keel, the prosecutor's arguments about an "intense emotion" do not alter our conclusion that any presumed instructional error is harmless.

**V.      We Strike the Parole Revocation Fine.**

The parties agree, as do we, that the trial court improperly imposed a suspended parole revocation fine pursuant to section 1202.45, subdivision (a).  While a section 1202.45 parole revocation fine is mandatory whenever a section 1202.4 restitution fine is imposed, such a fine is not authorized when the sentence does not encompass a period of parole.  (See *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505; see also *People v. Jenkins* (2006) 140 Cal.App.4th 805, 819; cf. *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 [parole revocation fine proper where defendant, in addition to being sentenced to death, also sentenced to determinate term].)

Appellant was sentenced to LWOP, consecutive to the indeterminate term he was already serving when this crime occurred.  He was not sentenced to any determinate term.  Thus, the parole revocation fine was improper.  Accordingly, we will strike this fine.

## DISPOSITION

The judgment is modified.  We strike the parole revocation fine imposed pursuant to section 1202.45.  The superior court is directed to prepare an amended abstract of judgment reflecting this modification, and to provide the amended abstract to the appropriate authorities.  As modified, the judgment is otherwise affirmed.


LEVY, Acting P. J.

WE CONCUR:


MEEHAN, J.


DE SANTOS, J.


48.